**FILED**

March 30 2010

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 08-0506

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 64

PPL MONTANA, LLC, a Delaware
Limited Liability Company,

        Plaintiff and Appellant,

  v.

STATE OF MONTANA,

        Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDV-2004-846
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Robert L. Sterup, Kyle Ann Gray, Holland & Hart LLP, Billings, Montana

        Paul J. Lawrence (argued), K&L Gates LLP, Seattle, Washington

    For Appellee:

        Hon. Steve Bullock, Montana Attorney General, Anthony Johnstone (argued), Solicitor, Helena, Montana

    For Amici Association of Gallatin Agricultural Irrigators:

        David L. Weaver, Nash, Zimmer, Weaver & Grigsby, Bozeman, Montana

    For Amici Montana Water Resources Association:

        Holly Jo Franz (argued), Franz & Driscoll, Helena, Montana

    For Amici Montana Farm Bureau Federation:

        Hertha L. Lund, Arthur V. Wittich, Wittich Law Firm, P.C., Bozeman, Montana

For Amici School Trust Representatives:

Pamela D. Bucy, Harley R. Harris, Luxan & Murfitt, PLLP, Helena, Montana

---

Argued:  September 16, 2009

Submitted:  October 27, 2009

Decided:  March 30, 2010

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1   On June 13, 2008, the First Judicial District Court entered findings of fact and conclusions of law in a cause of action between PPL Montana, LLC (PPL), and the State of Montana (State).  The District Court ordered PPL to pay the State $40,956,180 for its use of state-owned riverbeds from 2000 through 2007, at PPL hydroelectric power sites on the Missouri, Madison, and Clark Fork rivers.  We affirm the District Court's award of damages.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2   PPL is a Delaware limited liability company registered to do business in Montana. PPL is a wholesale electric generator[1] and owns and operates a number of federally-licensed hydroelectric facilities, or dams, in Montana.  A number of these dams are located on the Missouri, Clark Fork, and Madison rivers.  The "Thompson Falls Project" is located on the Clark Fork River and was built in 1915.  This facility was initially licensed by the federal government in 1949, and was re-licensed in December 1979 by the Federal Energy Regulatory Commission (FERC), pursuant to its authority under the Federal Power Act (FPA), 16 U.S.C.A. §§ 791a-823d (West 2010).  The Ryan, Cochrane, Morony, Rainbow, and Black Eagle dams are located on the Missouri River in Cascade County, Montana.  The Black Eagle facility was built in 1891, the Rainbow facility in 1910, the Ryan facility in 1915, the Morony in 1930, and the Cochrane in

---

[1]  In *State, Dept. of Revenue v. PPL Montana, LLC*, 2007 MT 310, 340 Mont. 124, 172 P.3d 1241, we explained that PPL is an "exempt wholesale generator."  This means that PPL is not subject to regulation by state public utility regulatory agencies, and may sell its electricity at whatever price the wholesale market will bear. *PPL Montana, LLC*, ¶ 23.

1958. The Holter and Hauser dams are located on the Missouri River in Lewis and Clark County, and were completed in 1918 and 1907, respectively. The Madison facility is located on the Madison River in Madison County and was completed in 1906. Additionally, the Hebgen facility, which was completed in 1915, is located on the Madison River in Gallatin County and provides storage capacity for downstream power generation.[2] The dams on the Madison and Missouri rivers are collectively referred to as the "Missouri-Madison Project" and were relicensed by FERC on September 27, 2000. The Thompson Falls and Missouri-Madison Projects were previously owned by the Montana Power Company (MPC), and sold to PPL on December 17, 1999.

¶3  On October 17, 2003, the parents of Montana school children sued PPL[3] in the United States District Court of Montana, seeking compensation for its use of state-owned riverbeds at its hydroelectric generation facilities. The plaintiffs argued that the riverbeds occupied by PPL's dams were part of the school trust lands and that PPL was obligated to compensate the State for their use. In *Montanans for the Responsible Use of the School Trust v. State*, 1999 MT 263, 296 Mont. 402, 989 P.2d 800 (*Montrust*), we defined "school trust lands" as state-owned public lands which the State Land Board (Land Board) is obligated to administer as a trustee for the benefit of the public schools in

---

[2] A storage facility such as Hebgen Dam is built on the upstream end of a hydroelectric project and has the ability to capture and store water that might otherwise be spilled downstream. This stored water can be released over time and used to generate electricity at downstream facilities in order to maximize productive output.

[3] The federal case, as well as the state case sub judice, also named two other Montana-based hydroelectric companies, Avista and PacifiCorp, as defendants. Both of these companies joined in PPL's challenges to the State's complaint in District Court, but settled with the State prior to trial. Although both of these companies filed numerous motions which were ruled upon by the District Court, because they were dismissed prior to trial and did not have a judgment entered against them, we will refer only to PPL in this Opinion.

Montana. *See Montrust*, ¶¶ 13-14. Under Article X of the Montana Constitution, the Land Board's fiduciary obligations include obtaining full market value for the use of school trust lands. *Montrust*, ¶ 17. Prior to this time, neither PPL nor its predecessor MPC had ever paid compensation to the State for the use of the riverbeds associated with its dams.

¶4 Although the State had never previously sought compensation for the use of the state-owned riverbeds by MPC or PPL, the State decided to join in the federal suit against PPL and was granted leave to do so on June 18, 2004. The State filed its own complaint requesting compensation from PPL under the school trust theory argued by the original plaintiffs, and also under the Hydroelectric Resources Act (HRA), Title 77, chapter 4, part 2, MCA. Originally enacted by the Legislature in 1931, § 77-4-201, MCA, of the HRA reads as follows:

> It is unlawful to sell or advertise for sale state lands constituting power sites or part of power sites capable of developing hydroelectric energy in commercial quantities. However, the [Land Board] may issue a lease or license to any person, corporation, or municipality for the development of power sites and the distribution, use, and disposition of the electrical energy generated on the sites as specifically provided in this chapter.

¶5 The term "power site" is specifically defined in the HRA as follows:

> The words "power site" as used in this part shall mean not only the state-owned land on which the dam is constructed, but also each separate tract of such land which will become part of the reservoir and which in and of itself makes an essential contribution to the value of the power site as a whole of not less than 5% of the entire value of such power site.

Section 77-4-202, MCA.

¶6 The federal cause of action was eventually dismissed for lack of subject matter jurisdiction. Prior to the dismissal of the federal suit, PPL filed a declaratory judgment action against the State in the First Judicial District Court on November 12, 2004. In its complaint, PPL contested the State's ability to seek compensation for its use of riverbeds at its FERC-licensed dams on the Clark Fork, Missouri, and Madison Rivers. PPL sought a declaration that the State could not seek compensation for its use of the riverbeds because these claims were federally preempted by the FPA as well the "federal navigational servitude."

¶7 The "federal navigational servitude" is the power of the United States Congress to ensure that navigable rivers remain open to interstate and foreign commerce. This servitude applies to navigable rivers acquired by states upon their entrance into the Union, and extends to all state-owned lands below the high-water mark. *See Mont. v. United States*, 450 U.S. 544, 551, 101 S. Ct. 1245, 1251(1981); *United States v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 312 U.S. 592, 596-97, 61 S. Ct. 772, 775 (1941). PPL argued that the existence of this servitude over the Clark Fork, Missouri, and Madison Rivers preempted the operation of the HRA upon its dams. Additionally, PPL sought declarations regarding several affirmative defenses, arguing that: (1) it had acquired a prescriptive easement to use the riverbeds at its facilities; (2) the State was equitably estopped from asserting a right to compensation under the HRA; (3) the State's ability to seek payments was barred by laches and the applicable statute of limitations;

and (4) the State breached agreements reached with PPL in the course of licensing its hydroelectric facilities.[4]

¶8 On November 24, 2004, the State answered, denying that the HRA was preempted by the FPA or by the federal navigational servitude. The State also counterclaimed seeking a declaration that PPL must compensate the State for its use of state lands, and seeking damages for PPL's unlawful past and ongoing use of those lands without compensation to the State. The State asserted that the Missouri, Clark Fork, and Madison Rivers were navigable rivers at the time of statehood, and that it acquired title to the beds and banks of these rivers when it became a state in 1889 under the "equal footing doctrine."[5] The State claimed that its ownership rights in these riverbeds and the HRA gave it the right to seek compensation for PPL's use of the occupied or submerged state lands used by its facilities. Additionally, the State argued that it was entitled to an award of damages under the theories of uncompensated use of state land, unjust enrichment, trespass, and negligence.

¶9 On the same day it filed its complaint, the State moved for summary judgment on PPL's complaint. The State asserted that neither the FPA nor the federal navigational servitude prevented it from seeking compensation for PPL's use of state lands. The State

---

[4] Affirmative defenses are normally asserted in response to a "preceding pleading." *See* M. R. Civ. P. 8(c). In this case, PPL asserted affirmative defenses in its initial complaint. Although this is unusual, it is most likely explained by the fact that the federal suit between PPL and the State involved the same claims which PPL sought to litigate in state court in Montana. Thus, PPL was already aware of the nature of the State's claims and had already formulated its defenses.

[5] The "equal footing doctrine" holds that a state acquires title to the streambeds of navigable rivers within its borders upon entrance to the Union. *See Opinion*, ¶ 22.

claimed that both the FPA and the FERC licensing procedures contemplated that landowners should be compensated for the use of their land under state law and affirmatively permitted, rather than preempted, the compensation the State was seeking. Additionally, the State argued that it was not subject to PPL's legal and equitable defenses.

¶10 From this point in the proceedings, PPL and the State engaged in an extensive motion practice. With some exceptions, these motions sought summary judgment rulings from the District Court on various aspects of the case. Because the instant appeal stems in large measure from the District Court's rulings on these motions, we will describe them now in chronological order.

### *Memorandum and Order of April 14, 2006, Regarding the State's Motion for Summary Judgment on PPL's Declaratory Judgment Action*

¶11 In its April 14, 2006 Memorandum and Order, the District Court granted summary judgment in favor of the State on PPL's declaratory judgment action. First, the District Court concluded that the State's claims for compensation were not preempted by the federal navigational servitude. As noted above, *see Opinion*, ¶ 7, the federal navigational servitude is the power of Congress to ensure that navigable waters remain open to interstate and foreign commerce. Citing to *Fed. Power Commn. v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 74 S. Ct. 487 (1954), the District Court observed that the exercise of the federal navigational servitude requires clear authorization from Congress. In *Niagara*, the Supreme Court held that Congress had not given such clear authorization under the FPA. *See Niagara*, 347 U.S. at 249-51, 74 S. Ct. at 493-94. The District Court

noted that federal courts interpreting the FPA have specifically held that it recognizes the property rights of parties whose land is affected by federally-licensed hydroelectric projects, and expressly prohibits the use of private property without proper compensation. *See United States v. Cent. Stockholders' Corp. of Vallejo*, 52 F.2d 322, 331-32 (9th Cir. 1931) (discussing the applicability of the FPA regarding property rights created under state law); *Public Utility Dist. No. 1 of Pend Oreille Co. v. City of Seattle*, 382 F.2d 666, 671-72 (9th Cir. 1967) (same). Accordingly, the District Court concluded that the federal navigational servitude did not preempt the State's claims for compensation.

¶12 The District Court also concluded that the FPA did not preempt the State's ability in general to seek compensation for PPL's use of state-owned riverbeds. The District Court noted the three types of federal preemption under Montana law: express, field, and conflict. *See Vitullo v. Int. Bhd. Of Elec. Workers, Local 206*, 2003 MT 219, ¶ 14, 317 Mont. 142, 75 P.3d 1250. In *Vitullo*, we described these forms of preemption as follows:

> This Court recognizes three ways in which federal law may preempt state law. The first is by express preemption, wherein Congress includes a preemption clause providing that state law will not apply in the area governed by the federal statute. Absent express preemption, this Court recognizes two types of implied preemption. The first is "field preemption," wherein the scheme of federal regulation is so pervasive or comprehensive that it is reasonable to infer that Congress intended to "occupy the field" and leave no room for supplementary state regulation. The second type of implied preemption is "conflict preemption." Conflict preemption manifests itself as an inability of state law to comply with federal law or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

9

*Vitullo*, ¶ 14 (citing *Dukes v. Sirius Constr., Inc.*, 2003 MT 152, ¶ 20, 316 Mont. 226, 73 P.3d 781; *Favel v. Am. Renovation and Constr. Co.*, 2002 MT 266, ¶ 40, 312 Mont. 285, 59 P.3d 412).

¶13 The District Court concluded that express preemption did not apply because the FPA did not contain any language expressly preempting state law. The District Court also concluded that neither field preemption nor conflict preemption barred the State's claims under the HRA.

¶14 Relying on *First Iowa Hydro-Electric Coop. v. Fed. Power Commn.*, 328 U.S. 152, 66 S. Ct. 906 (1946), the District Court noted that the FPA establishes a "dual system" of control between the states and the federal government. *First Iowa*, 328 U.S. at 167-68, 66 S. Ct. at 913. The FPA grants FERC the authority to issue licenses for the construction, operation, and maintenance of dams, including the power to regulate regarding the engineering, economic, and financial soundness of such facilities. *First Iowa*, 328 U.S. at 172, 66 S. Ct. at 915-16. However, the FPA also preserves the role of state law within the federal licensing structure. For instance, one section of the FPA requires an applicant for a FERC license to demonstrate that it has complied with the requirements of state law with respect to the "beds and banks and to the appropriation, diversion, and use of water for power purposes" for the state in which the proposed projected is located. *First Iowa*, 328 U.S. at 161 n. 6, 66 S. Ct. at 910 n. 6 (quoting 16 U.S.C. § 802); *see also* 16 U.S.C.A. § 821 (West 2010).

¶15 Moreover, federal courts have concluded the FPA recognizes the validity of state property rights and contemplates compensation for property use under state law. For

instance, in *Jordan v. Randolph Mills, Inc.*, 716 F.2d 1053 (4th Cir. 1983), the Fourth Circuit recognized that a FERC license "neither transfers nor diminishes any right of possession or enjoyment possessed by" a landowner, and that use of another's property by a FERC-licensee requires either acquisition of the owner's rights or the use of the power of eminent domain. *Jordan*, 716 F.2d at 1055. Additionally, the District Court noted that the FPA specifically requires licensees to notify any party who is an owner of record of any interest covered by a proposed project, including state, federal, and municipal entities. 16 U.S.C.A. § 802(b) (West 2010). The FPA also requires the licensee to submit information about the price paid for water rights, rights-of-way, lands, or interests in lands. 16 U.S.C.A. § 797(b) (West 2010). Further, federal courts have concluded that the FPA itself specifically allows property owners to bring state law tort actions against a licensee for damages caused by a hydroelectric facility pursuant to 16 U.S.C. § 803(c). *See Nez Perce Tribe v. Idaho Power Co.*, 847 F. Supp. 791, 812 (D. Idaho 1993) (stating that under 16 U.S.C. § 803(c) Congress did not preempt property-based state common law claims against FERC licensees); *DiLaura v. Power Auth. of the State of N.Y.*, 982 F.2d 73, 78 (2d. Cir. 1992) (same). In other words, while the FPA grants FERC the ultimate authority to license a hydroelectric project in accordance with federal law, it explicitly permits the operation of state law with regard to "proprietary rights" which may be affected by a FERC-licensed facility. *See First Iowa*, 328 U.S. at 175-76, 76 S. Ct. at 917. Accordingly, the District Court concluded that the FPA did not preempt the State's compensation claims against PPL.

11

¶16    The District Court also rejected the argument that the HRA was preempted by the FPA. As noted above, the HRA contains a section which authorizes the Land Board to enter into a lease with entities that use "power sites" within Montana for the generation of hydroelectric power. *See Opinion*, ¶¶ 4-5. However, Section 203 of the HRA reads as follows:

> In issuing any lease or license under the provisions of this part, the board shall have the power and it shall be its duty to incorporate in the lease or license such reasonable restrictions and regulations as it finds necessary in order to protect the interest of the state and its people.

Section 77-4-203, MCA.

¶17    PPL argued that Section 203 was an impermissible attempt by the State to regulate its FERC-licensed facilities, and that this section rendered the entire HRA preempted. The District Court agreed that Section 203 was preempted by federal law, but concluded that, given the FPA's clear recognition of state property rights, the FPA did not preempt those aspects of the HRA which empowered the State/Land Board to seek compensation. The District Court rejected the argument that the State's efforts to receive compensation through a lease with PPL somehow represented an impermissible infringement upon the federal government's licensing and regulatory authority under the FPA. As stated by the District Court,

> The Utilities take the position that merely asking them to sit down and negotiate a lease with the State constitutes regulation preempted under the Federal Power Act. However, the Court cannot accept this position. It would make no sense to reserve property rights under the Federal Power Act and then hold that any process to vindicate those rights is preempted. The ability to negotiate the terms and conditions of a lease is an incident of ownership all property owners possess. The Utilities cite a number of cases under the doctrines of field or conflict preemption in support of their

12

position. However, none of the cases are property cases, nor do they hold that a state is preempted from enforcing its property rights.

(Citations omitted.)

¶18 In sum, the District Court concluded that the FPA did not occupy the field or otherwise conflict with the State's efforts to seek compensation from PPL. However, the District Court declined to rule to on PPL's "as-applied" challenge to the HRA on federal preemption grounds, concluding that resolution of this question presented factual issues requiring a more developed record.

¶19 In this same order, the District Court also granted the State's motion for summary judgment on PPL's affirmative defenses. *See Opinion*, ¶ 7. With respect to PPL's claim for a prescriptive easement, the District Court noted that under Montana law a party cannot obtain title to government property through adverse possession or use. *See e.g. Roe v. Newman*, 162 Mont. 135, 142, 509 P.2d 844, 848 (1973) (citing *Bode v. Rollwitz*, 60 Mont. 481, 199 P. 688 (1921)). Regarding PPL's equitable estoppel defense, the District Court concluded that the State cannot be estopped by the unauthorized acts or representations of its officers or agents. *See Norman v. State*, 182 Mont. 439, 444, 597 P.2d 715, 718 (1979). Because no state employee would have the authority to make representations about the disposal of trust land in a manner contrary to the State and Land Board's fiduciary duties as trustees, *see Opinion*, ¶ 3, estoppel could not be asserted against the State in this case. The District Court further concluded that the defenses of laches and the statute of limitations were barred for similar reasons. Because the State claimed its efforts to seek compensation were taken in accordance with its trust duties

under the Montana Constitution, those efforts "stand on a different plane from an ordinary suit to regain title or remove a cloud upon it." *Norman*, 182 Mont. at 446, 597 P.2d at 719. Thus, the District Court concluded that estoppel, laches, and the statute of limitations could not be asserted against the State.

¶20　Finally, the District Court concluded that PPL could not assert a waiver or breach of agreement defense against the State. The District Court noted that under Montana law, a law established for a public reason cannot be contravened by private agreement. *See Collection Bureau Servs., Inc. v. Morrow*, 2004 MT 84, ¶ 9, 320 Mont. 478, 87 P.3d 1024; *see also Cape-France Enters. v. Est. of Peed*, 2001 MT 139, ¶¶ 33-34, 305 Mont. 513, 29 P.3d 1011. Under these principles, the State could not waive its right to rental payments, nor could it enter into an agreement which would have the effect of prohibiting it from carrying out its trust obligations.

¶21　Accordingly, the District Court granted the State's motion for summary judgment, disposing of PPL's preemption arguments and its affirmative defenses.

### *Memorandum and Order of August 28, 2007, Regarding the Navigability of the Missouri, Madison, and Clark Fork Rivers*

¶22　The State's ability to seek compensation from PPL was premised on the notion that it owned title to the riverbeds of the Missouri, Madison and Clark Fork rivers. The State sought a summary judgment ruling that title to these riverbeds passed to Montana when it became a state in 1889 pursuant to the "equal footing" doctrine. In *Mont. Coalition for Steam Access, Inc. v. Curran*, 210 Mont. 38, 682 P.2d 163 (1984), we described this doctrine as follows:

14

The landmark case dealing with state and federal ownership of beds underlying navigable waters is *Martin v. Waddell* (1842), 41 U.S. (16 Pet.) 367, 10 L.Ed. 997. In delivering the opinion of the Court, Mr. Chief Justice Taney stated, "For when the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the constitution to the general government." *Waddell,* supra.

.  .  .

States admitted to the Union subsequent to the original thirteen succeeded to the same rights on the theory that the lands acquired by the United States from the original thirteen colonies or from foreign governments were held in trust for the new states in order that they might be admitted on an equal footing with the original states. *Pollard's Lessee v. Hagan* (1845), 44 U.S. (3 How.) 212, 11 L.Ed. 565.

*Curran*, 210 Mont. at 44-45, 682 P.2d at 166-67.

¶23 The key inquiry in determining whether a state holds title to riverbeds under the equal footing doctrine is whether a river was "navigable" at the time the state entered the Union. In *United States v. Utah*, 283 U.S. 64, 51 S. Ct. 438 (1931), the Supreme Court described the test for navigability in the following terms:

"The rule long since approved by this court in applying the Constitution and laws of the United States is that streams or lakes which are **navigable in fact** must be regarded as navigable in law; that they are navigable in fact when they are **used, or are susceptible of being used**, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce."

15

*Utah*, 283 U.S. at 76, 51 S. Ct. at 441 (emphasis added) (quoting *United States v. Holt State Bank*, 270 U.S. 49, 56, 46 S. Ct. 197, 199 (1926)); *see also*, *The Daniel Ball*, 77 U.S. 557 (1870); *The Montello*, 87 U.S. 430 (1874).

¶24 Applying these standards, the District Court granted summary judgment to the State, holding there were no genuine issues of material fact that the Clark Fork, Missouri, and Madison rivers were "navigable in fact" at the time of statehood, and that the State was entitled to summary judgment on this issue as a matter of law.

¶25 With respect to the Missouri's navigability, the State presented evidence from the journals of Captains Meriwether Lewis and William Clark in the early 19th century wherein they described their journey from St. Louis, Missouri, to the Pacific Coast and their use of the Missouri River to travel through present-day Montana. The State asserted that after the Lewis and Clark expedition, a long succession of fur trappers plied the upper waters of the Missouri during Montana's territorial days. Other use of the river was made by miners and settlers from Helena, Montana, to the present-day towns of Great Falls and Fort Benton. The State also cited to a 1986 Montana Navigable River Study (River Study) of the Missouri River indicating commercial use of the river until the advent of the railroad system in the 1880's. Finally, the State referred to a 1974 study conducted by the Army Corps of Engineers, which determined that historical evidence supported the conclusion that the Missouri River was navigable from its headwaters near Three Forks, Montana, to Loma, Montana.

¶26 Additionally, the State claimed that the Missouri River had been declared a navigable river in previous administrative and judicial proceedings at both the state and

16

federal level. For instance, in a 1948 decision involving MPC, the Federal Power Commission (the precursor to FERC), concluded that the Missouri River, throughout its entire length, was considered a "navigable water of the United States." *See In re the Mont. Power Co.*, 7 F.P.C. 163, 173, 1948 WL 964 ** 10 (1948). The Court of Appeals for the District of Columbia subsequently affirmed this decision, holding that the 263 mile stretch of the Missouri from Fort Benton to Three Forks was a navigable water of the United States. *Mont. Power Co. v. Fed. Power Commn.*, 185 F.2d 491, 495 (D.C. Cir. 1950). Likewise, the State claimed that on two occasions this Court considered the Missouri to be a navigable river. *See Gibson v. Kelly*, 15 Mont. 417, 39 P. 517 (1895); *Herrin v. Sutherland*, 74 Mont. 587, 241 P. 328 (1925).

¶27 Turning to the navigability of the Madison, the State acknowledged that its early navigation had not been as extensively documented as that of nearby rivers. The State attributed this to its reputation as a forbidding region due to the alleged hostility of the Blackfeet Tribe during the exploration and trapping decades of the early 19th century. However, the State cited to a historical study of the Madison River which concluded that the Madison had experienced "considerable use historically by explorers, trappers, miners, farmers and loggers, and is generally considered to have high potential for navigation." Furthermore, the State relied upon the recorded observances of Captain Clark, who navigated the nearby Jefferson River and considered the Madison to be navigable as well based on his observations. The State also cited to documented instances in the 20th century of log floats down the middle portion of the Madison River,

17

although the State noted that by that point in the Madison's history, both the Hebgen and Madison dams prevented the free and unobstructed navigation of this river.

¶28 The State pointed out that in a previous nuisance suit against MPC regarding landholdings on the Upper Madison River which had been affected by the Madison dam, MPC did not dispute the navigability of the Madison River in court filings. *See Jeffers v. Mont. Power Co.*, 68 Mont. 114, 217 P. 652 (1923). Additionally, the State cited to a study by the Army Corps of Engineers from 1974, where the Corps concluded that in spite of post-statehood obstructions to the Madison River, it recommended that the entire Madison River be considered navigable from its boundary with Yellowstone Park to its confluence with the Missouri. Finally, the State noted that the Madison is heavily used today by commercial fishing guides and their clients, and that this use is also sufficient to support a conclusion that the Madison River was susceptible to commercial navigation at the time of statehood.

¶29 Turning to the Clark Fork River, the State claimed the historical record confirmed its navigation by fur traders from Pend Oreille Lake in present-day Idaho, to the mouth of the Thompson River above Thompson Falls, Montana, and that this same stretch of river was used for steam navigation until the 1860's. Based on a river study and a report by the Corps, the State cited to historical examples of use from the Thompson Falls area to its confluence with the Blackfoot River and beyond which supported a robust mining and timber industry. The State also cited to federal licensing proceedings which it contended established the navigability of the Clark Fork River. *See The Montana Power Co.*, 8 F.P.C. 751, 1949 WL 1102 (1949); *The Washington Water Power Co.* (Project No. 2058),

10 F.P.C. 657, 1951 WL 1856 (1951); *The Washington Water Power Co.* (Project No. 2075), 14 F.P.C. 731, 1955 WL 3030 (1955).

¶30 PPL opposed the State's motion, claiming there were genuine issues of fact as to whether the Missouri, Clark Fork, and Madison Rivers were navigable at the time of statehood in 1889. PPL presented an affidavit from Dr. David Emmons (Dr. Emmons), a professor of history at the University of Montana. Dr. Emmons opined, based on his review of the historical evidence, that none of the rivers were navigable at the time of statehood. With respect to the Missouri, Dr. Emmons opined that the "Great Falls Reach," a stretch of river about 32 miles above Fort Benton containing a series of rapids and falls which descend about 520 feet over 17 miles, had never been navigated. *See Mont. Power Co.*, 185 F.2d at 493 (describing the Great Falls Reach). Dr. Emmons claimed to base this conclusion on historical reports as well as reports from the Army Corps of Engineers from the 19th century, and the Lewis and Clark journals which described efforts to portage the Great Falls Reach. Dr. Emmons also noted that studies conducted by the Army Corps of Engineers determined that this stretch was not navigable and could only be made so at great expense.

¶31 Regarding the Madison, Dr. Emmons pointed to a 1931 Army Corps study which concluded that commercial navigation on this river was "entirely out of the question," and that as of 1931 there had never been any navigation on the Madison River. Dr. Emmons concluded these reports and studies presented conclusive evidence of non-navigability. Dr. Emmons discounted the observations of Lewis and Clark regarding

19

the navigability of the Madison by noting that they never actually attempted to ascend this river.

¶32    Furthermore, PPL disputed the propriety of relying upon present-day usage of the Madison River in order to prove navigability at the time of statehood.  PPL noted that the State relied on *Alaska v. Ahtna, Inc.*, 891 F.2d 1401 (9th Cir. 1989), in presenting this argument, but asserted that *Ahtna* was inapposite.  In *Ahtna*, the Ninth Circuit allowed present-day usage of the Gulkana River in Alaska to be considered in order to determine if it was susceptible to use at the time of Alaska statehood.  *Ahtna*, 891 F.2d at 1405.  PPL argued *Ahtna* was inapposite because the parties in that case had stipulated that the characteristics of the Gulkana had not changed since statehood.  Here, by contrast, PPL presented an affidavit from Dr. Stanley Schumm, a fluvial geomorphologist, that the characteristics of the Madison had changed since statehood, thus rendering *Ahtna* inapplicable.  In particular, Dr. Schumm stated that the Madison and Hebgen dams had altered the seasonal variations in the Madison River from those which were present at the time of statehood.  The flow during the highest periods of the year (May to June) had decreased, whereas the flow during the lowest periods of the year (October through November) had increased.  This increase was approximately two-thirds of a foot in October, to nine-tenths of a foot in November.  PPL argued that this expert analysis established that the Madison was more susceptible now to navigation than at the time of statehood, thus making present-day use, and reliance on the precedent established by *Ahtna*, untenable.  Furthermore, Dr. Schumm opined based on his expertise as a fluvial

20

geomorphologist that because of its historic, pre-statehood physical characteristics, the Madison River was not in fact susceptible to navigation at the time of statehood.

¶33    Finally, PPL argued that there were genuine issues of material fact regarding the navigability of the Clark Fork River at the time of statehood.  Relying again on the opinion of Dr. Emmons, PPL pointed to a 1891 Army Corps report to Congress stating that the reach of the Clark Fork from Lake Pend Oreille to the confluence of the Blackfoot River, roughly 6 miles upstream of Missoula, was a "torrential stream," full of rocks, falls, and rapids, and was "utterly unnavigable" and incapable of being made navigable except at an enormous cost.  PPL claimed that the Army Corps reiterated this view into at least the 1940's.  Finally, PPL pointed to an unreported federal 1910 decision from the District Court of Montana wherein the court decreed the portion of the Clark Fork River in Sanders County, Montana, to be "a non-navigable stream incapable of carrying the products of the country in the usual manner of water transportation . . . ."[6]

¶34    In addition to arguing that material facts precluded summary judgment, PPL also asserted that the State's evidence of historical use of these rivers was neither credible nor appropriately used.  For instance, PPL claimed that the River Study relied heavily upon two of the most unreliable sources of historical information from the frontier West: newspaper articles and personal reminiscences.  PPL asserted, through the affidavit of Dr. Emmons, that these sources were full of embellishments, and virtually worthless as documentary proof of events.  PPL also claimed that the State's "Corps reports" were

---

[6]  A citation for this case, captioned *Dolan v. Steele*, is not available in the Pacific Reporter, Westlaw, or Lexis.  A Xeroxed copy of this decision is contained in the appendix to PPL's briefs.

21

unreliable because they were not actually studies conducted *by* the Army Corps of Engineers, but were instead studies prepared *for* the Army Corps by some other entity.

¶35 Lastly, PPL argued that the State's reliance on previous federal administrative and judicial proceedings regarding the navigability of rivers in Montana was misplaced because those proceedings considered navigability for regulatory purposes, which is a different standard than navigability for title purposes. In particular, PPL noted that navigability for regulatory purposes under the FPA is established if the rivers were navigable in the past, or if they can be made navigable with reasonable improvements. Navigability for title, by contrast, does not allow navigability to be based on whether the river can be improved to a state of navigability. *See Or. v. Riverfront Prot. Assn.*, 672 F.2d 792, 794 n.1 (9th Cir. 1982) (discussing the distinctions between navigability for title and navigability for federal regulatory purposes). For all these reasons, PPL urged the District Court to deny the State's motion.

¶36 In its analysis, the District Court considered the definitions of "actual use" or "susceptible of being used" as used in the navigability for title test. Citing to *Utah v. United States*, 403 U.S. 9, 91 S. Ct. 1175 (1971), the District Court observed that "actual use" does not have to be commercially profitable under the navigability for title test. *See Utah*, 403 U.S. at 11, 91 S. Ct. at 1176. Similarly, under cases such as *The Montello* and *Holt State Bank*, the United States Supreme Court specifically noted that navigability is not limited to large-scale commercial navigation, nor indeed does it depend on the mode of transportation used on the river. *See The Montello*, 87 U.S. at 441-42; *Holt State Bank*, 270 U.S. at 56, 46 S. Ct. at 199. The District Court also opined that navigability

22

could be determined under the log-floating test this Court referenced in *Curran*. *See Curran*, 210 Mont. at 44, 682 P.2d at 166 (navigability for title can be established by evidence of log floats).

¶37     Addressing "susceptibility" of use, the District Court cited to *United States v. Utah*, 283 U.S. 64, 51 S. Ct. 438 (1931), and concluded that the key inquiry was whether the river was susceptible to being used in its ordinary condition, "rather than the mere manner or extent of actual use . . . ." *Utah*, 283 U.S. at 82, 51 S. Ct. at 443; *see also The Montello*, 87 U.S. at 441-42 (stating that "[i]f it be capable in its natural state of being used of purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway."). Relying also on *Riverfront Prot. Assn.*, 672 F.2d at 795, the District Court noted that such use "need not be without difficulty, extensive, or long and continuous."

¶38     With these legal principles in mind, the District Court evaluated the evidence of navigability presented by the State with respect to each river. Regarding the Missouri, the District Court concluded the State had presented "considerable evidence" of navigability. The District Court stated that the Federal Power Commission had previously determined the Missouri was a navigable river in 1948, and that this decision was subsequently affirmed by the Court of Appeals for the District of Columbia. *See Mont. Power Co.*, 185 F.2d at 494. The District Court discounted an argument advanced by PPL that the "Great Falls Reach" of the Missouri prevented it from being declared a navigable river. Citing to *The Montello*, 87 U.S. at 443, and *Utah*, 283 U.S. at 86-87, 51 S. Ct. at 445, the District Court concluded that a river is considered navigable for title

23

purposes even if it contains obstacles to free passage, such as rapids, riffles, or occasional areas of low water requiring portage, so long as the natural navigation of the river itself affords a channel for useful commerce.

¶39 For the Clark Fork, the District Court determined that the State had presented historical evidence showing it was navigable in fact, including documents showing that the river had been used for log drives. The District Court specifically cited to the following finding of fact issued by the FPC in a federal regulatory proceeding in 1949:

> The section of the Clark Fork River between Pend Oreille Lake in Idaho and the mouth of the Jocko River in Montana was used for the transportation of persons and property between areas now constituting the states of Oregon, Idaho, and Montana from 1810 to 1870, such use being canoe and batteaux transportation of furs by the fur traders of the British Northwest Fur Co., the canoe transportation of the original missionaries to the Indian tribes in the Clark Fork basin, and with the use of short portages around the Cabinet Rapids and Rock Island Rapids, by steamboats of the Oregon Steam Navigation Co. and its subsidiary, the Oregon & Montana Navigation Co. in the carriage of substantial numbers of gold miners, their pack animals and supplies, as well as commercial freight consigned to the gold camps in the vicinity of what is now Helena, Mont.

*The Mont. Power Co.* (Project No. 1869), 8 F.P.C. 751, 753, 1949 WL 1102 ** 2.

¶40 The District Court also noted that the Clark Fork had been declared navigable from Pend Oreille Lake to the Jocko River by the FPC in other proceedings as well. The District Court rejected PPL's argument that the findings of these proceedings could not be relied upon because they involved determinations of navigability for regulatory purposes. The District Court acknowledged differences between the navigability for title and regulatory purposes test, but observed it was not prohibited from relying on the findings generated by regulatory decisions in evaluating whether a Montana river

24

satisfied the navigability for title test. The District Court noted that obstructions requiring portages do not defeat a finding of navigability for title where the river provides a useful channel for commerce. *See The Montello*, 87 U.S. at 441-42; *Utah*, 283 U.S. at 86-87, 51 S. Ct. at 445. Here, the findings of the FPC and the other evidence presented by the State showed that the Clark Fork was used as a channel for commerce and met the navigability for title test.

¶41 Turning to the Madison River, the District Court acknowledged there was "little historical documentation" regarding use of this river. However, the 1986 River Study prepared for DNRC did conclude that the Madison River had experienced considerable use by explorers, trappers, miners, farmers, and loggers. The River Study also determined that the Madison had a "high potential for navigation." Furthermore, the River Study referred to at least one recorded example of a log float in 1913 on the middle portion of the Madison, from the mouth of its west fork to present-day Varney, Montana. Additionally, the District Court pointed out that the Madison today experiences "considerable recreational use." Despite the admittedly "sparse" record before it, the District Court concluded that the Madison was a navigable river.

¶42 Finally, with respect to each of these determinations, the District Court relied to some extent on the fact that PPL had admitted the navigability of these rivers in its answer to the State's counterclaims. The District Court concluded that PPL was bound by these admissions, and relied upon this point to help bolster its conclusions. Because the District Court explicitly relied upon PPL's admissions in coming to a decision, we must conclude they carried some weight in its final determination.

¶43 We take note of this aspect of the District Court's reasoning because prior to both the issuance of the scheduling order and the District Court's grant of summary judgment on the navigability issues, PPL filed a motion to amend its pleadings to remove any admissions regarding the navigability of the Clark Fork, Madison, and Missouri Rivers. In its brief in support, PPL claimed that its historical research had yielded documents which raised questions about the navigable status of the rivers on which its projects are located. In light of the State's responses to discovery requests and its research, PPL sought to amend its answer to account for this newly discovered information. However, PPL's motion was never properly addressed by the District Court. PPL raises this issue as an error requiring reversal, and we will return to this topic in our analysis of the District Court's decision.

### Memorandum and Order of August 28, 2007, Regarding Whether the Streambeds of the Missouri, Madison, and Clark Fork Rivers are School Trust Lands

¶44 The State sought summary judgment that Montana's navigable streambeds were part of the school trust lands pursuant to Article X, Section 2 of the 1972 Montana Constitution. This provision was carried forth from Article XI, Section 2, of the 1889 Montana Constitution and reads in pertinent part as follows:

> The public school fund of the state shall consist of:
> (1) Proceeds from the school lands which have been or may hereafter be granted by the United States . . .
> (4) All other grants of land or money made from the United States for general educational purposes or without special purpose . . . .

¶45 The State argued that the streambeds were school trust lands subject to fiduciary status under the Montana Constitution, and to the provisions of the HRA. The State

26

asserted that PPL was obligated to present to the Land Board a written application to lease or license a power site under the HRA, and that because it had failed to do so it should be held liable for all rents due under the HRA, and all other damages caused by its unlawful occupancy of state lands.

¶46 PPL argued that the riverbeds were not school trust lands, but instead were public trust lands held generally in trust for the benefit and use of all Montanans under the public trust doctrine. *See Curran*, 210 Mont. at 47-48, 682 P.2d at 168 (discussing the public trust doctrine and noting this doctrine "provides that states hold title to navigable waterways in trust for the public benefit and use . . . ."). This distinction was significant for PPL because if the riverbeds were public trust lands, it could possibly have the right to use them without paying the State compensation on the grounds that its use of water was a beneficial public use. By contrast, if the riverbeds were found to be school trust lands, the Land Board would be constitutionally required to charge PPL full market value for their use regardless of its character. *See Montrust*, ¶¶ 13-14.

¶47 In its August 28, 2007 memorandum and order, the District Court agreed with the State and concluded that the state-owned riverbeds were school trust lands. The District Court began its analysis with reference to the equal footing doctrine, noting that prior to Montana's admittance into the Union the United States held the riverbeds in trust for the future states. *See Pollard's Lessee v. Hagan*, 44 U.S. 212 (1845). The District Court noted that most courts have described state lands as "vesting" with a state upon its entrance to the Union. *See e.g. Arizona v. Cal.*, 373 U.S. 546, 597, 83 S. Ct. 1468, 1496 (1963), *overruled on other grounds by Cal. v. United States*, 438 U.S. 645, 98 S. Ct. 2985

27

(1978); *Or. v. Corvallis Sand and Gravel Co.*, 429 U.S. 363, 371, 97 S. Ct. 582, 587 (1977).

¶48     Once lands pass to the state under the equal footing doctrine, they are governed by state law. *See Mont.*, 450 U.S. at 551, 101 S. Ct. at 1251. Thus, it was important for the District Court to determine how lands received by Montana under the equal footing doctrine would be classified under the Montana Constitution. To make this determination, the District Court analyzed the plain meaning of the term "grant" as follows:

> The term "grant" is both a verb and a noun, and it has a number of meanings, depending on how it is used. When used as a verb, BLACK'S LAW DICTIONARY, defines "grant" as "1. To give or confer (something), with or without compensation. 2. To formally transfer (real property) by deed or other writing. 3. To permit or agree to. 4. To approve, warrant, or order." When used as a noun, "grant" means "1. An agreement that creates a right of any description other than the one held by the grantor. 2. The formal transfer of real property. 3. The document by which a transfer is effected. 4. The property or property right so transferred." BLACK'S LAW DICTIONARY (8th ed., 1999).

¶49     The District Court then considered how the term "grant" was used in each of the relevant provisions of the Montana Constitution. First, the District Court stated that under Article X, Section 2(1), school trust lands are those lands transferred to Montana by the grant of land from Congress under the 1889 Enabling Act. The equal footing lands did not fall into this category. Similarly, the District Court concluded that the term "grants" in Article X, Section 2(4) is used as a noun and refers to the transfer of title to lands owned by the United States. Thus, the equal footing lands did not technically fall into this class, since they were not "owned" by the United States prior to Montana's

28

admission as a state, but instead held in trust for Montana until such time as it became a state. Additionally, the District Court turned to Article X, Section 11(1), which relates to the public trust lands and reads as follows:

> **Section 11. Public land trust, disposition.** (1) All lands of the state that have been or may be granted by congress, or acquired by gift or grant or devise from any person or corporation, shall be public lands of the state. They shall be held in trust for the people, to be disposed of as hereafter provided, for the respective purposes for which they have been or may be granted, donated or devised.

¶50    The District Court interpreted the term "granted" as used in this section to refer to all the lands transferred to Montana through an action of Congress. While recognizing that the underlying legal basis for Montana's acquisition of the riverbeds was the equal footing doctrine, the District Court noted that the equal footing doctrine itself was not triggered until passage of the Enabling Act. Because this act was passed by the United States Congress, the District Court concluded that the riverbeds at issue were governed by Article X, Section 11(1), and were public trust lands of the State. As a result, the District Court reasoned, the Land Board had the authority to classify the lands as school trust lands, and had the authority to lease the riverbeds and use the funds for the support of public education.

¶51    Finally, at the conclusion of this order, the District Court noted that PPL had moved for summary judgment on the issue that any flooded lands resulting from its operations were not a part of the school trust lands. Without further addressing the merits of this argument, the District Court concluded that there remained genuine issues of material fact on this issue which precluded summary judgment.

29

¶52    In sum, the District Court concluded that the streambeds of the Missouri, Madison, and Clark Fork Rivers are school trust lands, granting summary judgment to the State. The District Court further denied PPL's motion for summary judgment that any flooded lands are not school trust lands.

### September 6, 2007 Memorandum and Order Regarding PPL's Motion for Partial Summary Judgment on the Application of the HRA

¶53    On October 6, 2006, PPL moved for summary judgment, arguing against application of the HRA. PPL advanced three reasons why it was entitled to summary judgment. First, PPL argued the HRA does not explicitly state that it applies to the streambeds of navigable rivers, and it therefore could not be applied to PPL's dams. Second, PPL noted that the District Court had already concluded that § 77-4-203, MCA, was federally preempted; this being so, PPL claimed that the remaining, non-preempted parts of the HRA could not be severed without invalidating the entire act. Third, PPL argued that the HRA could not be applied retroactively to those PPL facilities which were built prior to its passage in 1931.

¶54    The District Court denied PPL's motion. Addressing PPL's first argument, the District Court relied upon § 77-1-101, MCA (2005), which reads in pertinent part as follows:

> **77-1-101. Definitions.** Unless the context requires otherwise and except for the definition of state land in 77-1-701, in this title, the following definitions apply . . .
> (6)(a) "State land" or "lands" means:
> (i) lands granted to the state by the United States for any purpose, either directly or through exchange for other lands;
> (ii) lands deeded or devised to the state from any person; and

(iii) lands that are the property of the state through the operation of law.

¶55    The HRA is contained in Title 77, and therefore is governed by this statute. Because the District Court had previously concluded that the riverbeds were "granted" to Montana by the United States, it concluded that the riverbeds were state lands under § 77-1-101(6)(a), MCA (2005), and that the HRA applied. The District Court also noted that the definition of "power sites" in the HRA contained a specific definition which contemplated that the streambeds are state lands. *See Opinion*, ¶ 5. Thus, the District Court concluded that the HRA applied to the streambeds at issue in this case.

¶56    Turning to PPL's second argument, the District Court simply referred back to its order of April 14, 2006, wherein it held that federal law did not preempt the State from seeking compensation from PPL under the HRA. The District Court did not conduct any additional analysis in rejecting this argument.

¶57    Finally, the District Court addressed PPL's argument that the HRA could not be applied to dams built before the act's passage in 1931. PPL claimed the application of the HRA in this manner would impose upon it a new licensing process, require bidding for a proposed license or lease, and impose undefined financial obligations on its hydroelectric projects, thus impairing its vested rights. The District Court disagreed. The District Court noted that Article XVIII, Sections 1 and 3, of the 1889 Montana Constitution predated the construction of any of PPL's dams and specifically contained the trust provisions carried forward to the 1972 Montana Constitution. *See Montrust,* ¶ 13. The existence of this constitutional obligation since 1889 prevented the state from

31

selling or conveying interests in public state lands without obtaining full market value for them. Because the 1889 Constitution established the State's interest in the riverbeds of the Missouri, Clark Fork, and Madison Rivers, PPL never in fact held any interests in those streambeds. In this connection, the HRA merely provided a statutory basis for the Land Board to exercise those obligations originally set forth in the 1889 constitution. "As a result," the District Court concluded, "the [HRA] is not being applied retroactively; rather the State, as trustee of public lands, is complying with its constitutional mandate."

¶58 Accordingly, the District Court denied PPL's motion for summary judgment seeking to preclude application of the HRA as a basis for the State to seek compensation in this case.

### September 12, 2007 Memorandum and Order Regarding PPL's Motion for Partial Summary Judgment That the Right to Appropriate Water for Beneficial Use of Hydropower Includes the Incidental Right to Use State Land

¶59 On October 6, 2006, PPL also moved for summary judgment on its claim that the right to appropriate water for beneficial use, as recognized and confirmed in both the 1889 and 1972 Montana Constitutions, includes the incidental right to use state land. PPL claimed that this right is not contingent upon the payment of rent for its alleged occupation of state land in conjunction with its dams. PPL argued that its rights of appropriation were analogous to those of irrigators, stockmen, miners, and municipalities, and that its dams were no different than ditches, ponds, flumes, or intake pipes used to divert and appropriate water for other forms of beneficial use. PPL argued that under Article IX, Section 3 of the 1972 Montana Constitution, the people of Montana have defined water rights in a manner that includes the incidental use of beds and banks for the

32

apparatus of hydropower use and, as a result, the State was barred from seeking compensation for the use of beds and banks for those hydropower projects.

¶60 The District Court denied PPL's motion for summary judgment on this issue. Citing to Article IX, Section 3(2) of the Montana Constitution, the District Court acknowledged that hydroelectric generation is a beneficial use under Montana law. This provision reads as follows:

> The use of all water that is now or may hereafter be appropriated for sale, rent, distribution, or other beneficial use, the right of way over the lands of others for all ditches, drains, flumes, canals, and aqueducts necessarily used in connection therewith, and the sites for reservoirs necessary for collecting and storing water shall be held to be a public use.

¶61 While hydropower may be a beneficial use of water, the District Court nevertheless concluded that nothing in the Montana Constitution or state law expressly allows a party to use state lands while appropriating water for beneficial use without paying compensation to the State for the occupancy and use of those lands. Furthermore, the District Court noted that it had already concluded that the State held title to the riverbeds, and held those lands in trust for the people of Montana. As a result, the State is under a constitutional obligation to protect those lands, and is specifically prohibited from alienating or disposing of them without obtaining compensation. For these reasons, the District Court denied PPL's motion for summary judgment on this issue.

### September 13, 2007 Memorandum and Order Regarding the Parties' Motions to Strike

¶62 On October 6, 2006, PPL moved to strike the affidavits submitted by the State in support of its motion for summary judgment regarding the navigability of the Missouri, Clark Fork, and Madison Rivers. In support of its summary judgment motion, the State

had submitted affidavits from Monte Mason (Mason), an employee for the DNRC, and State Archivist Jodie Foley (Foley). In his affidavit, Mason rendered his opinion that the Clark Fork, Missouri, and Madison Rivers were navigable at the time of statehood. He based these conclusions on a number of reports and studies attached as exhibits. PPL claimed that in his deposition, Mason admitted he had no personal knowledge of these studies or their preparation. PPL claimed that because Mason lacked personal knowledge of the contents, accuracy, or reliability of the exhibits, they should be stricken from consideration for purposes of summary judgment. Additionally, PPL argued the State failed to show that any of the documents or exhibits upon which Mason relied fell into recognized exceptions to the hearsay rule. For instance, one attached exhibit was the River Study prepared by the Heritage Research Center of Missoula in December 1986. Because Mason had no personal knowledge of how it was prepared, and it was less than 20 years old at the time its admittance was sought in May 2006, it could not be admitted under the Montana Rules of Evidence as an ancient document or through Mason. *See* M. R. Evid. 901(8).

¶63 PPL presented a similar argument with respect to another attached exhibit, an undated report on the navigability of the Clark Fork River prepared for the Army Corps of Engineers. Mason could not personally attest to its contents, and could not demonstrate that it was more than 20 years old. Two other exhibits challenged by PPL were navigability reports on the Madison and Missouri Rivers completed by the Army Corps of Engineers in 1974. While these two reports did appear to meet the prima facie test of being at least 20 years old, PPL argued their admission was barred because they

34

were based on the accounts of others in old newspapers, old books and similar publications regarding matters that reportedly occurred in the late 1800's or early 1900's. Because the State could not establish any first-hand knowledge of these events by authors of these reports, PPL argued they were inadmissible hearsay whose defects could not be cured by admission under the ancient document exception.

¶64 PPL asserted that 38 documents attached to Foley's affidavit were inadmissible hearsay for largely the same reasons. PPL noted that the majority of these documents were "excerpts from books or magazine articles written by authors, typically years after the recounted events, and do not provide a basis for any personal knowledge of the matters discussed." PPL argued that all historical evidence, except for sources based on direct, first-hand accounts like the Lewis and Clark Journals, were inadmissible and should be stricken from consideration.

¶65 Again, the District Court denied PPL's motion. First, it considered the affidavit of Mason and accompanying exhibits. The District Court observed that Mason averred in his affidavit that DNRC has conducted numerous studies to determine and document the ownership of state lands, and that it had in fact commissioned the 1986 River Study. Mason averred that the River Study compiled historical evidence for over 43 different rivers in Montana in order to assist DNRC in determining state ownership of streambeds for leases of trust land. Mason also averred that he relied on the reports prepared by the Army Corps in making determinations regarding the navigability of the rivers at issue. Based on an analysis of the affidavit, the District Court concluded that Mason regularly relies upon the River Study and Army Corps reports in carrying out his official duties,

and that these documents were relevant to the issues at hand. The District Court concluded that the attachments to Mason's exhibits would likely be admissible at trial. Although the District Court acknowledged the documents were hearsay, it nonetheless concluded that the State would likely be able to lay a foundation for the admission of these exhibits if required to do so.

¶66 Employing a similar rationale, the District Court held that the Foley affidavit and accompanying exhibits could be considered on summary judgment as well. The District Court noted that Foley's affidavit simply authenticates the documents listed and attached to her affidavit in accordance with her duties as a state archivist. Although the documents themselves are hearsay, the District Court determined Foley would likely be able to lay a foundation for the admissibility of these documents at trial. For these reasons, the District Court denied PPL's motion to strike.

¶67 Upon the resolution of these motions and the District Court's determination that the State was entitled to seek compensation from PPL for its use of the state-owned riverbeds and streams "occupied" by its dams, the stage was set for a bench trial on the State's counterclaims for compensation. A seven-day bench trial was held from October 22 to 30, 2007, and the District Court received expert testimony and argument from both parties. The primary issues were the amount of compensation the State was entitled to recover from PPL for its use of the riverbeds, and whether the HRA is preempted on an "as applied" basis by the FPA. The District Court was tasked with considering the methodology which should be used to calculate damages, whether the State was entitled

to prejudgment interest, and whether the Land Board or the District Court should determine full market value for PPL's use of state-owned land.

¶68   On June 13, 2008, the District Court entered a Memorandum of Decision (Memorandum) and a final order containing findings of fact and conclusions of law (Final Order).  In its Memorandum the District Court first addressed PPL's "as applied" federal preemption challenge to the operation of the HRA.  PPL maintained that the HRA, as applied, was preempted by the FPA because it was impossible for PPL to comply with the mandates of both statutes.  PPL noted that § 77-4-209, MCA, of the HRA permits the Land Board to enter into a lease for a term of no greater than 50 years.  However, under the FPA's implementing regulations FERC requires a licensee to "acquire title in fee or the right to *use in perpetuity* all lands, other than lands of the United States" within 5 years of the issuance of a license for a hydroelectric facility under Article 5 of a standard FERC license.  *See Standardized Conditions for Inclusion in Preliminary Permits and Licenses Issued Under Part I of the Federal Power Act*, 54 F.P.C. 1792, 1834, 1975 WL 14631 **36 (1975) (emphasis added) (discussing Article 5 of Form L-5).  PPL claimed that the 50-year limitation on state leases frustrated the objective of the FPA.  Furthermore, PPL argued that the leasing process described in the HRA, *see* §§ 7-4-204 to 207, MCA, also contravened the regulatory purpose of the FPA as well as its FERC licenses.

¶69   The District Court determined that the FPA did not preempt the HRA under an "as applied" challenge.  The District Court observed that the State's obligation to seek compensation stemmed from its fiduciary duties to administer public trust lands under

Article X, Section 11, of the Montana Constitution. Referring to *First Iowa*, the District Court noted that the United States Supreme Court had previously concluded that the FPA does not preempt property rights pursuant to state law, and allows states to seek compensation for the use of state lands by FERC-licensed facilities. Secondly, the District Court determined that FERC had the ability to alter the "in perpetuity" clause in PPL's license, noting that 18 C.F.R. § 2.9(a) (2010), states that "[t]he Commission has approved several sets of standard conditions for normal inclusion in preliminary permits or licenses for hydroelectric developments. In a special situation, of course, the Commission in issuing a permit or license for a project will modify or eliminate a particular article (condition)." Indeed, the District Court observed that FERC permitted just such a modification in *Cooper Valley Electric Assn., Inc.*, 4 F.E.R.C. ¶ 61336, 1978 WL 15902 (1978), and allowed a FERC licensee to hold an interest in land which would be a part of its hydroelectric facility without the requirement that it be "in perpetuity." *See Cooper Valley*, 4 F.E.R.C. ¶ 61336 at ¶ 61796, 1978 WL 15902 **1. Thus, the District Court concluded that the Land Board had the authority to enter into a lease under the HRA, provided that such a lease would comply with FERC regulations.

¶70 The District Court then considered whether the State could seek rent for affected acreage lying both above and below PPL's dams, or, as argued by PPL, it could seek rent based solely on affected acreage above PPL's dams. To resolve this question, the District Court turned to § 77-4-202, MCA, of the HRA, which defines the term "power site." The District Court concluded that the statute was clear on its face, and it was not necessary to resort to the rules of construction in order to determine if PPL could be assessed for

38

acreage below its dams. The District Court noted again that the State's claim for compensation was based on Article X, Section 11, of the Montana Constitution, in its role as the trustee of state lands. Because the riverbeds below and above PPL's dams were state-owned lands and fell within the HRA's definition of a "power site," the State was required to obtain full market value for the use of those lands under *Montrust*.

¶71 The District Court also considered the State's claims for prejudgment interest pursuant to § 27-1-211, MCA. It rejected this claim under the criteria set forth in *Ramsey v. Yellowstone Neurosurgical Assocs.*, 2005 MT 317, ¶ 19, 329 Mont. 489, 125 P.3d 1091, because the amount of compensation was not certain or capable of being made certain when PPL purchased the Thompson Falls and Missouri-Madison Projects. Furthermore, neither DNRC nor the Land Board had adopted a rule as to how to set rent for the use of a "power site" under the HRA, requiring a trial in order to determine the appropriate methodology for this assessment.

¶72 Next, the District Court addressed the question of what methodology should be used in order to assess the amount of compensation due to the State. This issue was the focus of much of the trial. PPL argued that the State was entitled to recover only the value of the estate or interest conveyed by its dams (i.e., an easement for the footprints created by the dam), and that any damages based on its occupation of state-owned riverbeds would be limited to the value of the "flowage easement" from its use. The State, by contrast, argued for a damage assessment based on what it termed the "shared net benefits" methodology.

¶73     Under this methodology, net benefits of a project would be determined by calculating the difference between the value of the power produced and the cost of producing that power.  The net benefits (i.e., the profits), would then be distributed 50-50 between the project owner and the land owners.  In the Memorandum, the District Court noted that § 77-4-208, MCA, of the HRA required the Land Board to obtain full market value for PPL's use of power sites, as "carefully ascertained from all available sources." The District Court observed that riverbeds have unique characteristics which make them valuable for the production of hydropower, and concluded that the "shared net benefits" methodology as presented by the State would best take into consideration the economic contributions the state lands make to hydropower projects.   In this connection, the District Court stated that the Supreme Court of Maine had concluded this methodology was appropriate to apply to the assessment of rents for a hydroelectric facility in *State v. Cent. Me. Power Co.*, 640 A.2d 1067 (Me. 1994), and that it had been applied by FERC to assess hydroelectric facilities in previous regulatory proceedings involving tribal lands.

¶74     Lastly, the District Court considered whether it or the Land Board should decide the fair market value of the riverbeds.  PPL had argued that under the HRA, the Land Board, and not the District Court, was the proper authority to decide the fair market value rental or lease rate for PPL's use of the power sites.  The District Court rejected this argument, and held that it could determine the fair market value for PPL's past use of the state-owned lands.  First, the District Court noted that PPL had not raised this issue in the pretrial order.  Second, it distinguished *Montanans for the Responsible Use of the Sch. Trust v. Darkenwald*, 2005 MT 190, 328 Mont. 105, 119 P.3d 27, noting that the case sub

judice did not involve a challenge to actions taken by the Land Board. *See Darkenwald*, ¶ 6 (noting that the appeal in that case was a direct challenge to the actions of the Land Board). Finally, the District Court held that it would not rule on the terms of a lease between PPL and the Land Board extending into the future, as that matter would be properly left to the discretion of the Land Board.

¶75    In its Final Order, the District Court applied the rationale set forth in the Memorandum to the argument and evidence presented by the parties at trial. The District Court noted its previous rulings discussed above, and concluded it would apply the State's "shared net benefits" method to assess damages. The District Court relied principally upon the State's expert economist, John Duffield, Ph.D. (Dr. Duffield), in order to arrive at damages for PPL's use of the state-owned power sites from 2000 to 2007. The District Court rejected the valuation offered by PPL's expert, Gary Saleba (Saleba), who based his rental assessment on the methodology used by FERC to determine the amounts PPL should pay for using federal lands at its Montana facilities, pursuant to 18 C.F.R. § 11.2 (2010).[7] The District Court noted that Saleba's methodology did not employ the "shared net benefits" methodology, did not include

---

[7] "Reasonable annual charges for recompensing the United States for the use, occupancy, and enjoyment of its lands (other than lands adjoining or pertaining to Government dams or other structures owned by the United States Government) or its other property, will be fixed by the Commission [i.e., FERC]. In fixing such charges the Commission may take into consideration such factors as commercial value, the most profitable use for which the lands or other property may be suited, the beneficial purpose for which said lands or other property have been or may be used, and such other factors as the Commission may deem pertinent." 18 C.F.R. § 11.2(a) (2010).

below the dam acreage, and arrived at a much lower figure than that calculated by Dr. Duffield.

¶76    To arrive at his calculations, Dr. Duffield utilized documents either produced or publicly filed by PPL to conclude that PPL owed the State past rents, excluding interest, from 2000 to 2006 in the amount of $8,988,436 for Thompson Falls Project.  The 2007 rent for this project was $1,950,592.  This figure was based on the calculation that the State owned 54.6 % of the power site, and that the State was entitled to a 27.3% share, or half, of the net benefits of the project.  For the Madison-Missouri Project, Dr. Duffield concluded that PPL owed the State past rent, excluding interest, of $25,759,825 for 2000 through 2006.  The 2007 rent due for the Madison-Missouri Project was $4,257,327.  The percentage shares of state ownership of the lands constituting each separate hydroelectric facility are as follows:  Hebgen, 5.7%; Madison, 6.8%; Hauser, 17.6%; Holter, 26.2%; Black Eagle, 96.2%; Rainbow, 63.6%; Cochrane, 79.3%; Ryan, 39.7%; and Morony, 62.9%.  With the Hebgen Dam's benefits allocated to downstream facilities,[8] the State's share of the net benefits of each of these facilities is as follows:  Madison, 3.3%; Hauser, 8.6%; Holter, 12.8%; Black Eagle, 46.9%; Rainbow, 31.0%; Cochrane, 38.8%; Ryan, 19.4%; and Morony, 30.8%.

¶77    Judgment in the amount of $40,956,180 was entered against PPL on August 18, 2008.  PPL now appeals from this judgment, as well as the rulings discussed above.  We state the issues as follows:

---

[8]  Because the Hebgen Dam was a storage facility which does not itself produce power, Dr. Duffield allocated its benefits to facilities which were downstream of its location.

¶78    **Issue One:**  *Did the District Court err in granting summary judgment regarding the navigability of the Clark Fork, Missouri, and Madison Rivers at the time Montana became a state in 1889?*

¶79    **Issue Two:**  *Did the District Court err in granting summary judgment to the State on the issue of whether Montana's navigable riverbeds are school trust lands?*

¶80    **Issue Three:**  *Did the District Court err in granting summary judgment on whether the right to appropriate water for beneficial use of hydropower includes the incidental right to use state land?*

¶81    **Issue Four:**  *Did the District Court err in granting summary judgment regarding the availability of PPL's affirmative defenses against the State's claims?*

¶82    **Issue Five:**  *Did the District Court err in concluding that the HRA applied to the Thompson Falls and Missouri-Madison Projects?*

¶83    **Issue Six:**  *Did the District Court err in its calculation of damages?*

## STANDARD OF REVIEW

¶84    We review de novo a district court's grant of summary judgment, employing the same standards utilized by the district court pursuant to M. R. Civ. P. 56.  *Smith v. Burlington Northern and Santa Fe Ry. Co.*, 2008 MT 225, ¶ 10, 344 Mont. 278, 187 P.3d 639.  The moving party must establish the absence of genuine issues of material fact and entitlement to judgment as a matter of law.  *Smith*, ¶ 10.  Once this burden has been satisfied, the non-moving party must present substantial evidence essential to one or more elements of the case to raise a genuine issue of material fact.  *Smith*, ¶ 10.  Reliance upon "conclusory statements" lacking specific factual support is not sufficient to raise a

genuine issue of material fact. *Smith*, ¶ 10; *see also Tin Cup Co. Water and/or Sewer Dist. v. Garden City Plumbing & Heating, Inc.*, 2008 MT 434, ¶ 54, 347 Mont. 468, 200 P.3d 60 ("[C]onclusory statements and assertions do not constitute facts that are 'material and of a substantial nature' that would prevent summary judgment.").

¶85 Because we review a grant of summary judgment de novo, we need not defer to the judgments and decisions of the district court. *See Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 53, 345 Mont. 12, 192 P.3d 186. This rationale applies to evidentiary rulings in the summary judgment context. We review evidentiary rulings going directly towards the propriety of summary judgment de novo, in order to determine whether the evidentiary requirements for summary judgment have been satisfied. *See Smith*, ¶¶ 41-42.

¶86 Outside of the summary judgment context, we review a district court's conclusions of law for correctness and its findings of fact under the clearly erroneous standard. *Roe Family, L.L.C. v. Lincoln Co. Bd. of Commrs.*, 2008 MT 70, ¶ 12, 342 Mont. 108, 179 P.3d 514.

## DISCUSSION

¶87 **Issue One:** *Did the District Court err in granting summary judgment regarding the navigability of the Clark Fork, Missouri, and Madison Rivers at the time Montana became a state in 1889?*

¶88 Analysis of this issue involves the consideration of three key questions. The first is whether the District Court erred in relying upon the Mason and Foley affidavits and attached exhibits for purposes of summary judgment. The second is whether the District Court correctly interpreted and applied the navigability for title test in granting the State's

44

motion for summary judgment. The third is whether there exist genuine issues of material fact which preclude summary judgment.

**A. The District Court's Reliance Upon the Mason and Foley Affidavits and Accompanying Exhibits**

¶89 PPL filed a motion to strike the affidavits of Mason and Foley, as well as the exhibits attached thereto. *See Opinion*, ¶¶ 62-64. PPL argued these affidavits were based on inadmissible hearsay and should not be considered in the summary judgment context. The District Court denied the motion. While the District Court agreed that the supporting exhibits contained hearsay, it reasoned that they would nonetheless likely be admissible at trial. *See Opinion*, ¶¶ 65-66.

¶90 PPL argues the District Court erred in considering the Mason and Foley affidavits and attached exhibits. PPL claims the District Court permitted the State to rely entirely on inadmissible hearsay in order to carry its burden of proof on summary judgment. PPL contends that Mason conceded in deposition testimony that his entire testimony regarding navigability was based upon the reports attached in his affidavit, yet he was not familiar with the preparation of the reports and could not personally testify to their accuracy, reliability, or the methods used to generate them. PPL claims the same is true with respect to the Foley affidavit and exhibits. PPL also claims that its expert Dr. Emmons directly opined that the State's evidence on summary judgment lacked credibility to prove anything about the historical use of the rivers and was instead based on dubious historical sources. Under these circumstances, PPL argues the State's evidence should not have been considered on summary judgment.

¶91 In response, the State first asserts that courts applying the navigability for title test routinely rely on historical evidence. Second, while it admits the historical record in this case is hearsay because there is no one alive today who personally witnessed the condition of Montana's rivers in 1889, the State argues that such evidence is not excluded by the hearsay rule itself. The State contends that the evidence in this case is admissible under several hearsay exceptions contained in M. R. Evid. 802 and 803. The State further posits that because the subject matter of this issue is beyond the recall of living witnesses, the District Court properly allowed the admission of this type of hearsay evidence.

¶92 M. R. Civ. P. 56(e) states that supporting and opposing affidavits in the summary judgment context "shall be made on personal knowledge, [and] shall set forth facts as would be admissible in evidence . . . ." In *Smith*, we stated that affidavits made without personal knowledge and based on hearsay should not be considered on summary judgment. *Smith*, ¶ 39. However, we also stated that exhibits may be submitted in support of a summary judgment affidavit so long as a proper foundation can be laid for such exhibits based on any exception to the rule excluding hearsay evidence. *Smith*, ¶ 39. While unauthenticated documents should not be considered on summary judgment, a document can be considered if it is " 'authenticated by and attached to an affidavit that meets the requirements of [Rule] 56(e) and the affiant [is] a person through whom the exhibits could be admitted into evidence.' " *Smith*, ¶ 47 (quoting *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550-51 (9th Cir. 1990)). Furthermore,

self-authenticated documents can be considered on summary judgment pursuant to M. R. Evid. 902. *Smith*, ¶ 49.

¶93   Foley is the State Archivist of the Montana Historical Society.  In her affidavit, Foley attached a number of historical works and periodicals, and swore under oath that they were true copies of the publications and documents from the collection of the Montana Historical Society.  M. R. Evid. 902 contains ten categories of documents for which "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required . . . ."  M. R. Evid. 902(4), (5),(6), and (8) read as follows:

> (4) Certified copies of public records.  A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) or complying with any law of the United States or of this state.
> (5) Official publications.  Books, pamphlets, or other publications purporting to be issued by public authority.
> (6) Newspapers and periodicals.  Printed materials purporting to be newspapers or periodicals.
>
> .   .   .
>
> (8) Acknowledged documents.  Documents accompanied by a certificate of acknowledgement executed in the manner provided by law by a notary public or other officer authorized by law to take acknowledgements.

¶94   All of the documents listed in the Foley affidavit fall into one or more of these categories, and would be admissible as self-authenticating documents under M. R. Evid. 902.  Furthermore, many of the documents submitted with the Foley affidavit would be

admissible under M. R. Evid. 901(8), which provides for the admission of documents which meet the following requirements:

> Ancient documents or data compilation. Evidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered.

Additionally, Foley, as the State Archivist, would be able to lay a foundation for these exhibits if required to do so under M. R. Evid. 803(8), the "public records and reports" exception to the hearsay rule. *See Mont. Petroleum Tank Release Compensation Bd. v. Crumleys Inc.*, 2008 MT 2, ¶¶ 79-81, 341 Mont. 33, 174 P.3d 948 (discussing the application of M. R. Evid. 803(8)). The Foley exhibits are clearly admissible under a hearsay exception and the District Court did not err in considering them for purposes of summary judgment.

¶95 Mason is the Minerals Management Bureau Chief for DNRC. He states in his affidavit that he is in charge of leasing the minerals in and under the streambeds of navigable rivers in Montana. In order to discharge these official duties, DNRC has conducted numerous streambed studies to determine and document the state ownership of land in Montana. In 1986, DNRC commissioned the River Study, a historical study of the navigable rivers in Montana. Mason swore that a true copy of this study was attached to his affidavit. The River Study is clearly admissible under M. R. Evid. 803(8) or 902(4). The Mason affidavit references three other documents as well: (1) an Army Corps report on the navigability of the Clark Fork River prepared in or around 1975; (2) an Army Corps navigation study of the Madison River completed in 1974; and (3)

48

another Army Corps study of the Missouri completed in 1974. Mason avers that true copies of each of these documents are attached to his affidavit. Mason's affidavit established that these studies and reports were pulled from the records kept by the DNRC used in pursuance of its official duties. These records are undoubtedly admissible under M. R. Evid. 803(8). *Mont. Petroleum*, ¶ 80 (holding that data pulled from records regularly kept by the Montana Department of Environmental Quality was admissible under the public records exception to the hearsay rule). The Mason affidavit and exhibits were admissible and properly considered by the District Court.

¶96 Furthermore, we agree with the State that reliance upon historical works, including newspaper accounts, is well-accepted and proper when applying the navigability for title test. Courts applying this test are often required to arrive at factual determinations regarding matters outside the recall of any living witnesses, thus requiring a higher degree of reliance upon historical material than in the run of the mill civil dispute. *See Montana Power*, 185 F.2d at 498 ("[I]t is settled that historical works generally considered authentic are admissible in evidence, especially in cases such as this one which must delve into the relatively ancient and obscure origins of commerce on the nation's rivers."); *Conn. Light & Power Co. v. Federal Power Commn.*, 557 F.2d 349, 354-56 (2d. Cir. 1977).

**B. The District Court's Interpretation and Application of the Navigability for Title Test**

¶97 The evidence before the District Court having been properly considered, the question remains as to whether this evidence justified a grant of summary judgment in

favor of the State. The key inquiry here is whether the District Court's interpretation and application of the navigability for title test was correct, since this test sets forth the legal standard the State must meet for summary judgment and also indicates the type and quantum of evidence PPL must present in order to raise a genuine issue of material fact.

¶98 Broadly speaking, the District Court perceived the navigability for title test as somewhat "fluid." For instance, the District Court concluded that the test allowed present-day usage to be probative as to navigability of a river at the time of statehood. The District Court also concluded that portages do not defeat navigability, so long as the river itself was used, or susceptible of being used, as a channel of commerce at the time of statehood. These two points were crucial aspects of the District Court's grant of summary judgment on the navigability question due to the presence of rapids, falls, and obstructions on the Clark Fork and Missouri Rivers, and because the early usage of the Madison River was admittedly not well-documented.

¶99 Our independent review of the caselaw in this area establishes unequivocally that the District Court's understanding of the navigability for title test was correct. The concept of navigability for title purposes is very liberally construed by the United States Supreme Court. A river does not have to experience "actual use" at or before the time of statehood, so long as it was "susceptible" of providing a channel for commerce. " '[T]he true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation,' and . . .'it would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway.' " *Utah*, 283 U.S. at 76,

50

51 S. Ct. at 441 (quoting *The Montello*, 20 U.S. at 441). Moreover, "carrying places," portages, or other obstructions which require a resort to "artificial means" of navigation, are not sufficient to defeat a finding of navigability. As stated by the United States Supreme Court in *The Montello*,

> Indeed, there are but few of our fresh-water rivers which did not originally present serious obstructions to an uninterrupted navigation. In some cases . . . they may be so great while they last as to prevent the use of the best instrumentalities for carrying on commerce, but the vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers, such as rapids and sand-bars.

*The Montello*, 87 U.S. at 443.

¶100 Additionally, the term "commerce" in the navigability for title context is very broadly construed. For instance, in *Utah*, the United States Supreme Court explicitly embraced the notion that emerging and newly-discovered forms of commerce can be retroactively applied to considerations of navigability.

> [T]he government urges that the consideration of future commerce is too speculative to be entertained. Rather is it true that, as the title of a state depends upon the issue, the possibilities of growth and future profitable use are not to be ignored. Utah, with its equality of right as a state of the Union, is not to be denied title to the beds of such of its rivers as were navigable in fact at the time of the admission of the state either because the location of the rivers and the circumstances of the exploration and settlement of the country through which they flowed had made recourse to navigation a late adventure or because commercial utilization on a large scale awaits future demands. The question remains one of fact as to the capacity of the rivers in their ordinary condition to meet the needs of commerce as these may arise in connection with the growth of the population, the multiplication of activities, and the development of natural resources. And this capacity may be shown by physical characteristics and experimentation as well as by the uses to which the streams have been put.

*Utah* , 283 U.S. at 83, 51 S. Ct. at 443-44.

Because navigability is based upon a broad definition of commerce combined with an "actual" or "susceptible of use" standard, present-day usage of a river may be probative of its status as a navigable river at the time of statehood. *See Ahtna*, 891 F.2d at 1404-05.

¶101 The evidence presented by the State was clearly sufficient to demonstrate navigability in fact under this test, and entitlement to judgment as a matter of law. Despite the presence of portages along the Clark Fork and Missouri Rivers, the historical evidence establishes that they provided a channel for commerce at the time of statehood, or were susceptible of such use. While the historical usage of the Madison was not as well-established, the evidence of a log float on its middle portion in the 19th century, combined with its present-day usage, demonstrates that this river was susceptible of providing a channel for commerce at the time of statehood.

**C. The Existence of Genuine Issues of Material Fact Precluding Summary Judgment on the Navigability of the Clark Fork, Missouri, and Madison Rivers**

¶102 On appeal, PPL argues it has shown that genuine issues of material fact exist regarding the navigability of each of these rivers. PPL notes that its expert, Dr. Emmons, rendered an expert opinion declaring that each of these rivers were non-navigable at the time of statehood, and based his opinions on the following sources: (1) a 1910 federal court decree declaring portions of the Clark Fork non-navigable; (2) a congressional report based on a 1930's Corps of Engineers survey stating that the Madison river has never been historically navigated and that commercial navigation on this river was "entirely out of the question"; and (3) historic reports from the Corps of Engineers that

the Great Falls Reach of the Missouri is unnavigable, and that Stubbs Ferry Reach could only be made navigable at great cost. Additionally, PPL notes that its fluvial geomorphologist, Dr. Schumm, opined that the presence of PPL's Hebgen and Madison Dams on the Madison in the early 20th century "materially changed the flow characteristics" of this river. Based on historic evidence of river depth, flow histograms, and stage-discharge curves, Dr. Schumm opined that the Madison was not susceptible to navigation at the time of statehood. *See Opinion*, ¶ 32.

¶103 Setting aside the fact that PPL relies upon precisely the type of second-hand historical information which it has argued at length is unreliable and inadmissible in the summary judgment context, we hold that this evidence was simply insufficient to raise a genuine issue of material fact regarding navigability on the Clark Fork, Missouri, and Madison Rivers. With respect to the Missouri, the obstructions of the Great Falls Reach were insufficient to defeat a finding of navigability, because they were portaged by the Lewis and Clark expedition, and many others, early in the 19th century, allowing the Missouri to provide a useful channel of commerce. With respect to the Clark Fork and Madison River, PPL's sole evidentiary basis for raising a genuine issue of material fact consists of conclusory statements regarding the navigability of portions of these rivers made by a federal district court in 1910, and Corps of Engineers in the 1930s. Such conclusory statements, without any specific factual support, are insufficient as a matter of law to raise genuine issues of material fact. The fact that these statements were made in the early 1900's does not somehow cure them of their conclusory nature and lack of specific factual basis. *See Tin Cup*, ¶ 54.

¶104 Dr. Schumm's expert opinion regarding the flow changes in the Madison River since the time of statehood likewise does not raise a genuine issue of material fact regarding its susceptibility for commerce at the time Montana became a state. The present-day recreational use is sufficient for purposes of "commerce" under *Utah* and *Ahtna*. The fact that the seasonal variations on the Madison River have been altered to depths of less than 1 foot by the presence of dams, fails to demonstrate that the Madison was not susceptible for use as a channel of commerce at the time of statehood. Indeed, so long as the Madison was susceptible for use during portions of the year, it is considered navigable at the time of statehood under the navigability for title test. *See Utah*, 283 U.S. at 87, 51 S. Ct. at 445 (noting that a river can be generally considered navigable unless its use is "exceptional, being practicable only in times of temporary highwater.").

¶105 Finally, PPL argues virtually every stretch of a river must be "navigable in fact" and that particular stretches of a river which are non-navigable due to their physical characteristics can defeat a finding of navigability with respect to the whole river, or require a piecemeal classification of navigability—with some stretches declared navigable, and others declared non-navigable. The source for this argument derives from *Utah*. In that case, the United States Supreme Court considered the navigability of rivers within the state of Utah of which the United States government sought title. The United States sought to quiet Utah's title to certain sections of portions of the Green, Colorado, and San Juan Rivers in Utah. *Utah*, 283 U.S. at 71, 51 S. Ct. at 439. A special master had been appointed to enter findings of fact regarding these rivers, some of which contained long stretches of non-navigable waters. Specifically, the special master found

54

that a roughly 40-mile stretch of the Colorado River, beginning at the confluence of the Green and Grand Rivers in Utah, was non-navigable. *Utah*, 283 U.S. at 79, 51 S. Ct. at 442. The state of Utah challenged the special master's findings only with respect to the first 4.35 miles of this stretch of the Colorado. *Utah*, 283 U.S. at 80, 51 S. Ct. at 442.

¶106 The United States Supreme Court did consider the navigability with regard to certain sections of the rivers, as opposed to the rivers themselves as a whole. However, the *Utah* Court also emphasized the limited applicability of its approach in the following terms:

> In the present instance, the controversy relates only to the sections of the rivers which are described in the complaint, and the master has limited his findings and conclusions as to navigability accordingly. The propriety of this course, in view of the physical characteristics of the streams, is apparent. Even where the navigability of a river, speaking generally, is a matter of common knowledge, and hence one of which judicial notice may be taken, it may yet be a question, to be determined upon evidence, how far navigability extends. The question here is not with respect to a short interruption of navigability in a stream otherwise navigable, or of a negligible part, which boats may use, of a stream otherwise nonnavigable. **We are concerned with long reaches with particular characteristics of navigability or nonnavigability, which the master's report fully describes.**

*Utah*, 283 U.S. at 77, 51 S. Ct. at 441 (footnotes omitted) (emphasis added). The United States Supreme Court ultimately agreed with the state of Utah that the first 4.35 miles of the disputed stretch were navigable and reversed the findings of the special master on this point. *Utah*, 283 U.S. at 89-90, 51 S. Ct. at 446.

¶107 PPL urges this Court to rely upon *Utah* and declare certain portions of the rivers at issue in this case—such as the Great Falls Reach of the Missouri River and the rapids and the obstructions to navigation in the vicinity of PPL's Thompson Falls Project on the

Clark Fork River—non-navigable. We decline the invitation to do so, and find PPL's reliance on *Utah* misplaced. In *Utah*, the overall non-navigability of the 40-mile stretch of the Colorado River was not disputed by either party, and was never ruled upon by the Supreme Court itself. Instead, the state of Utah merely disputed whether the first 4.35 miles of this stretch were non-navigable. Furthermore, as the *Utah* Court made clear, the "section-by-section" approach does not apply to "short interruption[s] of navigability in a stream otherwise navigable . . . ." *Utah*, 283 at 77, 51 S. Ct. at 441. In *Utah* there was no evidence presented that the remaining non-navigable 36-mile stretch of the Colorado was ever successfully portaged, or that it was merely a "short interruption" in the overall navigability of this portion of the Colorado River.

¶108 Here, PPL has not put forth any evidence whatsoever of "long reaches of non-navigability" but instead merely points to relatively short interruptions in the Clark Fork, Missouri, and Madison Rivers which impede uninterrupted navigation, but do not affect the actual use or susceptibility of use of these rivers as channels for commerce in Montana at the time of statehood. The Great Falls Reach, even though a roughly 17-mile stretch of the Missouri River, is merely a short interruption in the use of the Missouri as a channel for useful commerce, as evidenced by the Lewis and Clark expedition's portage of this area, and the well-documented actual use of the Missouri subsequent thereto. *See e.g. Mont. Power Co.*, 185 F.2d at 493-94. The same is true with respect to the Clark Fork River—even though there are interruptions to unimpeded navigation on this river in the vicinity of PPL's Thompson Falls project, the actual use of the Clark Fork is documented from the Pend Oreille Lake at least to this river's confluence with the

Blackfoot River. PPL's dams on the Madison River are also merely short interruptions in the navigation of this river as well. The present-day usage of the Madison is probative as to its "susceptibility of use" at the time of statehood, and it is self-evident that any obstructions on the Madison do not defeat its current use as a channel for commerce within the state of Montana.

¶109 PPL's evidence of relatively short interruptions of navigability in the rivers at issue is insufficient as a matter of law under *Utah* to declare any portions of these rivers non-navigable. Furthermore, under *Utah*'s expansive definition of the "susceptible of use" standard, it is equally clear that the present-day usage of the Madison, Clark Fork, and Missouri Rivers demonstrates that these rivers were susceptible of providing a useful channel of commerce throughout the state of Montana at the time of statehood.

**D. Conclusion**

¶110 From the foregoing analysis, we conclude the District Court did not err in granting summary judgment to the State on the issue of whether the Clark Fork, Missouri, and Madison Rivers were "navigable in fact" at the time of Montana statehood 1889. Under the navigability for title test, Montana has held title to these riverbeds beginning in 1889. According to the equal footing doctrine, the disposition, use, and ownership interests in the beds of these rivers has been governed by state law since that time. *Mont.*, 450 U.S. at 551, 101 S. Ct. at 1251.

¶111 One of the issues raised by PPL in this appeal concerns the District Court's failure to rule on its motion to amend, and the extent to which the District Court improperly relied on PPL's admissions in rendering its decision on the navigability question. *See*

57

*Opinion*, ¶¶ 42-43. The District Court should have ruled upon this motion to amend prior to its summary judgment decision on this issue. However, it is equally true that PPL did not raise this omission until the trial was well underway, long after the final pretrial order had been issued. In any event, we have not relied upon any ostensible admissions made by PPL in our analysis regarding the navigability of these rivers in its responsive pleadings.

¶112  In summary, under de novo review, we conclude that the District Court's ultimate ruling on the navigability of the Clark Fork, Missouri, and Madison Rivers at the time of statehood was correct. It is an axiom of Montana law that we will affirm a district court if it reaches the right result, even though its reasoning may not be entirely correct. *Good Schs. Missoula, Inc. v. Missoula Co. Pub. Sch. Dist. No. 1*, 2008 MT 231, ¶ 24, 344 Mont. 374, 188 P.3d 1013. Thus, we affirm the District Court on this issue.

¶113  **Issue Two:** *Did the District Court err in granting summary judgment to the State on the issue of whether Montana's navigable riverbeds are school trust lands?*

¶114  PPL argues that the District Court erred in concluding that the riverbeds at issue are school trust lands. PPL claims that the riverbeds are not lands specifically indentified in the Enabling Act, nor are they school trust lands under Article X, Section 2 of the Montana Constitution. Rather, PPL asserts, the riverbeds are public lands subject to the public trust doctrine this Court discussed in *Curran*. *See Curran*, 210 Mont. at 47-48, 682 P.2d at 167-68.

¶115  The District Court rejected the argument that the riverbeds fell under the terms of the Enabling Act, or Article X, Section 2 of the Montana Constitution. The District Court

58

then determined, based on the plain meaning of the term "grant" as used in Article X, Section 11(1), that the riverbeds were in fact public trust lands of the State. From this point, the District Court went on to conclude that the riverbeds were school trust lands on the theory that the Land Board had the authority to classify them as such. However, as PPL notes, the Land Board has never taken this action.

¶116 We conclude that the District Court was correct in concluding that the riverbeds are public trust lands pursuant to Article X, Section 11(1) of the Montana Constitution. However, the District Court erred in concluding that the riverbeds were school trust lands on the assumption that the Land Board could, in theory, classify them as such. Even if the Land Board could arguably classify the riverbeds as school trust lands, the simple fact remains that it has not done so.[9]

¶117 We reverse the District Court's determination that the riverbeds are school trust lands, and hold instead that they are public trust lands under Article X, Section 11(1) of the Montana Constitution. Although we conclude the riverbeds at issue are not school trust lands, the Land Board is still required to administer these lands in accordance with the trust obligations imposed by Article X, Section 11 of the Montana Constitution. As such, the riverbeds are held "in trust for the people" and shall not "ever be disposed of except in pursuance of general laws providing for such disposition, or until the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, has been paid or safely secured to the state." Mont. Const. Art. X, § 11(2); *See Norman v. State*, 182 Mont. 439, 444, 597 P.2d 715, 718 (1979).

---

[9] We express no opinion on whether the Land Board has the legal authority to take such actions.

¶118 **Issue Three:** *Did the District Court err in granting summary judgment on whether the right to appropriate water for beneficial use of hydropower includes the incidental right to use state land?*

¶119 PPL argues the District Court erred when it concluded that its right to appropriate water for the purposes of hydroelectric power generation did not include the incidental right to use state land. The District Court determined that Montana law did not exempt PPL from paying the State for the use of state lands while appropriating water for a beneficial use. PPL claims that the right to appropriation includes the right to the means of appropriation—in this case, the dams. Thus, PPL asserts it cannot be assessed rent for its occupancy of state lands, as such occupancy is an incident of its lawful right to appropriate water. PPL claims this position is supported by a number of cases, including *Smith v. Denniff*, 24 Mont. 20, 60 P. 398 (1900), *United States v. Conrad Inv. Co.*, 156 F. 123 (D. Mont. 1907), *Prentice v. McKay*, 38 Mont. 114, 98 P. 1081 (1909), and more recently *Mattson v. Mont. Power Co.*, 2009 MT 286, 352 Mont. 212, 215 P.3d 675.

¶120 In response, the State notes that PPL does not hold title to the riverbeds at issue, and has not acquired an easement over state lands to appropriate water. For this reason, the State argues that PPL's reliance on the cases cited above is misplaced since they involved preexisting easements, or the appropriation of water on federal lands. In short, the State claims that no state law permits the free appropriation of water on state lands, or immunizes PPL from the HRA's requirement to pay compensation.

¶121 We affirm the District Court. The cases relied upon by PPL simply do not establish that PPL has a right to make *free* appropriation of waters on and within state-owned lands without paying any compensation to the State. *Denniff* and *Mattson*,

60

for instance, stand for the unremarkable proposition that the right of appropriation includes the right to an appropriate means of diversion. *See Mattson*, ¶¶ 37-40 (discussing necessary incidents of use for an easement held by PPL at a dam on Flathead Lake); *Denniff*, 24 Mont. at 28-30, 60 P. at 401-02 (discussing the ability of a valid water appropriator to acquire an easement over private land in order to exercise his right to appropriation). In *Prentice*, this Court observed that while the State recognizes the rights of individuals to acquire the use of water by appropriation, such use is nonetheless subject to the requirements of state law. *Prentice*, 38 Mont. at 117, 98 P. at 1083. Finally, as the State correctly notes, *Conrad Inv.* involved federal, not state land, and has no bearing on the operation of state law in this case.

¶122 Simply put, the cases cited do not stand for the proposition that PPL's use and appropriation of the water, and the incidents necessary to enjoy such appropriation, affect or limit the State's ownership interests in the riverbeds, the State's ability to subject such use to the requirements of Montana law, or its ability to seek compensation for an appropriation of water occurring entirely upon public lands. None of these cases demonstrate that PPL's right of appropriation of water and its use of dams to occupy Montana's riverbeds, occurring as it does entirely within the public lands of Montana, is somehow exempted from the operation of the Montana Constitutions of 1889 and 1972, and the HRA. For these reasons, the District Court did not err in concluding that PPL's appropriation of water does not include an incidental right to the *free* use of state land, and that PPL is required to pay the State compensation for the use of the state-owned riverbeds.

¶123 **Issue Four:** *Did the District Court err in granting summary judgment regarding the availability of PPL's affirmative defenses against the State's claims?*

¶124 PPL contends that the District Court erred in granting summary judgment to the State regarding the availability of affirmative defenses against the State's claims for compensation. PPL argues that the State's claims are barred by §§ 27-2-103 and 70-19-302, MCA. Section 27-2-103, MCA, states that the limitations on causes of actions set forth in Title 27, chapter 2, part 2, MCA, "apply to actions brought in the name of the state or for the benefit of the state in the same manner as to actions by private parties." PPL claims that statutes of limitations regarding trespass (§ 27-2-207(1), MCA), negligence (§ 27-2-204(1), MCA), liability created by statute (§ 27-2-211(1)(c), MCA), and action not founded upon contract or promise (§ 27-2-202(3), MCA), variously apply to bar the State's claims for compensation. Furthermore, PPL argues that § 70-19-302, MCA, sets a 10-year statute of limitations on actions brought by the State respecting "real property or the issues or profits thereof by reason of the right or title of the state to the same," and also applies in the instant case.

¶125 The State counters that § 70-19-302, MCA, is inapplicable since it applies only to "all lands sold and conveyed before July 1, 1955, by the state of Montana for which a valid consideration was received by the state; provided that the state, at the time of any such sale or conveyance, was not precluded by the constitution of Montana or by the terms of the grant of such lands by the United States from selling and disposing of the same . . . ." Section 70-19-301, MCA. Here, the riverbeds were never sold to PPL, nor could the State have alienated these lands in violation of the Montana Constitution.

62

Second, the State argues that the statute of limitations defenses must yield in this case to the riverbeds' status as public trust lands. The State claims that the application of statutes of limitation would violate the Montana Constitution under *Norman* and *State ex. rel. Boorman v. State Bd. of Land Commrs.*, 109 Mont. 127, 94 P.2d 201 (1939). For these reasons, the State urges us to affirm the District Court.

¶126   We agree with the State that § 70-19-302, MCA, is inapplicable to the case at bar. As § 70-19-301, MCA, makes abundantly clear, this section cannot apply to the riverbeds at issue because they were never, nor could they be, alienated from the public trust. Furthermore, we agree with the District Court and the State that the statute of limitations defenses which are applicable in a normal civil suit do not apply here because the riverbeds are public trust lands under Article X, Section 11 of the Montana Constitution. *See Norman*, 182 Mont. at 446, 597 P.2d at 719 (noting that the government's efforts to enforce and maintain a policy respecting lands held in the public trust trumps the equitable and legal affirmative defenses which are normally available against State actions); *see also Chennault v. Sager*, 187 Mont. 455, 460, 610 P.2d 173, 176 (1980) (stating that the interests of the general public should not be defeated by the unauthorized or unlawful acts of public agents or officers) (citing *Norman*). The Land Board and the State both have a fiduciary obligation under the Montana Constitution to seek compensation for the use of state-owned lands. The HRA provides the statutory mechanism for assessing this compensation. The State and Land Board's lack of diligence in carrying out these trust duties cannot be asserted as an affirmative defense

63

against the State's claims. Thus, we affirm the District Court's decision to bar PPL's assertion of affirmative defenses against the State.

¶127 **Issue Five:** *Did the District Court err in concluding that the HRA applied to the Thompson Falls and Missouri-Madison Projects?*

¶128 The resolution of this issue involves two distinct inquiries: (1) whether the District Court erred in granting summary judgment to the State on the federal preemption of the HRA and in rejecting PPL's "as-applied" challenged to the HRA; and (2) whether the HRA can be lawfully applied to PPL's hydroelectric facilities.

**A. The Federal Preemption and "As-Applied" Challenges to the HRA**

¶129 In response to summary judgment motions filed by PPL, the District Court ruled that § 77-4-203, MCA, of the HRA was preempted by federal law, *see Opinion*, ¶¶ 16-17, but nonetheless held that the remaining provisions of the HRA were not federally preempted and that the State/Land Board was permitted to seek compensation from PPL. After trial, the District Court also rejected PPL's "as-applied" preemption challenge to the HRA. PPL argues the District Court erred in these rulings. PPL claims that the HRA is in irreconcilable conflict with the FPA and FERC licensing requirements. Specifically, PPL maintains that the HRA's limitation of a 50-year lease in §§ 77-4-201 and -209, MCA, conflicts with the FPA's requirements that the lands affected by a FERC-licensee must be held by that licensee "in perpetuity." *See Opinion*, ¶ 68.

¶130 Furthermore, PPL notes that the FPA invests FERC with the sole discretion of choosing the operator for a hydropower site. 16 U.S.C.A. §§ 797(e), 800(a) (West 2010). The FPA's implementing regulations also invest FERC with the sole discretion regarding

64

the transfer of a license. 16 U.S.C.A. § 801 (West 2010); 18 C.F.R. §§ 9.1-9.3 (2010). PPL argues that the HRA contains several provisions, in addition to Section 203—which was stricken by the District Court—that invest the Land Board with precisely the type of licensing discretion reserved solely to FERC. For instance, § 77-4-204, MCA, allows the Land Board to conduct a "preliminary examination as to the value of the power site, as to the plans of development submitted by the applicant, and of all other matters relating to the proposed development as it deems necessary for the proper disposition of the business." Sections 77-4-205 through -207, MCA, describe the bidding process the Land Board is required to follow prior to granting a lease, including a provision to give preferences to municipalities. PPL contends that the application of these provisions is in conflict with the discretion granted to FERC under the FPA. PPL also asserts that the HRA's 50-year lease limitation and bidding/examination provisions stand as an obstacle to the FPA's objectives and are federally preempted.

¶131   In this connection, PPL argues that the HRA cannot survive a severability analysis because the core of this act is regulatory in nature. As we stated in *Finke v. State*, 2003 MT 48, 314 Mont. 314, 65 P.3d 576, "[w]hen a law contains both constitutional and unconstitutional provisions, to determine whether the unconstitutional provisions are severable, we examine the law itself for the existence of a severability clause. If there is no such clause, we must determine whether the unconstitutional provisions are necessary for the integrity of the law or were an inducement for its enactment." *Finke*, ¶ 25. PPL notes that the HRA does not contain a severability clause. It furthers contends that Sections 203 through 207 demonstrate that the core of the HRA is regulatory in nature.

As such, the core of the HRA is in direct conflict with the regulatory authority given to FERC under the FPA. For this reason, PPL argues the operation of the HRA is entirely preempted.

¶132 The State claims the HRA is not federally preempted by the FPA. In this connection, the State notes that the FPA requires licensees to compensate landowners for the use of their property. Regarding PPL's severability argument, the State contends that the core of the HRA is not regulatory, but rather compensatory in a manner consistent with the Land Board's constitutional obligation to seek recompense for the use of public trust lands.

¶133 We agree with the State. The core of the HRA is compensatory, not regulatory. The fundamental purpose of the HRA as stated in § 77-4-201, MCA, is to ensure that the Land Board is able to obtain compensation for the use of state-owned lands which are used by hydroelectric facilities. The FPA permits private landowners, including states, to seek and receive compensation for the use of their land. The core of the HRA is not in conflict with the FPA and survives the federal preemption and severability analyses. While PPL objects that the bidding process described in §§ 77-4-204 through -207, MCA, conflicts with FERC's exclusive jurisdiction to issue and/or transfer licenses, the fact is that the State has never resorted to such a process. If the bidding process discussed in §§ 77-4-204 -207, MCA, was at some point utilized and ran afoul of FERC requirements, then it would arguably be preempted on an "as applied" basis. However, no such conflict exists at the present. Moreover, even if such further preemption of the

HRA were to occur, it would not alter the fact that the core of the HRA is compensatory, not regulatory, in nature.

**B. PPL's Challenge to the Application of the HRA**

¶134   PPL also claims that the HRA is being "retroactively" applied to it in a manner contrary to law.  PPL correctly notes that the HRA does not contain a retroactivity clause, and argues that its language indicates it was designed to apply to the development of future power sites.  *See* § 77-4-204, MCA (stating that the Land Board examines "matters related to the proposed development . . . ."); § 77-4-206, MCA (stating that the Land Board is to determine whether a lease applicant is "capable of carrying out the proposed development . . . .").  Further, PPL argues that the HRA's application in this case violates principles of Montana law.  Citing to *Porter v. Galarneau*, 275 Mont. 174, 911 P.2d 1143 (1996), PPL argues that application of the HRA would violate the prohibition against retroactive application of the law because it "takes away or impairs vested rights acquired under existing laws or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions already passed." *Porter*, 275 Mont. at 183, 911 P.2d at 1148-49 (quotations omitted).  Among these new obligations, PPL argues, is the requirement that PPL pay the State approximately $41 million dollars in back compensation.  The claimed impairment of PPL's vested rights also includes the fact that it may now be subject to competitive bidding proposals and possibly not be granted a lease by the Land Board.

¶135   The District Court held that the HRA was not being retroactively applied in this case because Montana acquired title to the riverbeds when it became a state in 1889 and

67

Article XVIII, Sections 1 and 3, of the 1889 Montana Constitution—which predate the construction of any of PPL's dams—specifically prevented the state from selling or conveying interests in public state lands without obtaining full market value for them. Thus, neither PPL nor MPC could claim a vested interest in using the State's riverbeds for free. *See Opinion*, ¶ 57.

¶136 We agree with the District Court's reasoning on this point. In providing a statutory basis for leasing state-owned power sites, the HRA codifies an aspect of a constitutional provision which was extant in 1889. MPC and PPL took ownership of the dams subject to the constitutional trust status of these state lands. *See Montrust*, ¶ 19 (citing *Dept. of State Lands v. Pettibone*, 216 Mont. 361, 375, 702 P.2d 948, 956-57 (1985)). While PPL claims that the HRA's bidding process may arguably cause it to lose its ability to operate the dams, that situation is not before the Court in the present appeal, nor is it even remotely probable.[10]

¶137 PPL also argues that the HRA was intended to apply only to Section 17 and 36 school trust lands, and not to the non-school trust riverbeds at issue in this case. As support for this contention, PPL points to various legislative and supporting materials which it claims show the Legislature never intended the HRA to apply to dams which were already located on the riverbeds in 1931.

¶138 The starting point for statutory construction is the plain language of the statute, and if the plain language is clear and unambiguous no further interpretation is required.

---

[10] In this connection, we note that the State is seeking damages for past due rent and is simply requesting that PPL enter into a leasing agreement with the Land Board—an action which both Pacificorp and Avista have already taken.

68

*Vader v. Fleetwood Enterprises, Inc.*, 2009 MT 6, ¶ 30, 348 Mont. 344, 201 P.3d 139. As noted above (*see Opinion*, ¶¶ 54-55), § 77-1-101(6), MCA (2005), states that the provisions in Title 77 apply to "state lands." The riverbeds at issue are state lands within the meaning of § 77-1-101(6), MCA (2005). Thus, as the plain language of the HRA and Title 77 demonstrates that the statute applies to PPL's facilities, resort to other methods of statutory construction is not required.

¶139 We accordingly conclude that the District Court did not err in determining that the HRA was not federally preempted by the FPA, and that it could be lawfully applied by the State to seek compensation for PPL's use of state-owned riverbeds at its hydroelectric facilities.

¶140 **Issue Six:** *Did the District Court err in its calculation of damages?*

¶141 Before turning to the methodology and reasoning employed by the District Court in its calculation of an award of damages, we take note of the legal basis upon which this award was granted. In the District Court's conclusions of law in the Final Order, it held that: (1) the riverbeds are state school trust lands; (2) the State has a constitutional duty to obtain full market value for their use under the Montana Constitution; (3) under § 77-4-208, MCA, of the HRA, the rental for power sites "shall be not less than full market value . . . ."; (4) the FPA did not preclude the State from seeking compensation for PPL's use of state-owned lands; and (5) the State was entitled to compensation based on the "shared nets benefits" methodology and the acreage computation presented by its experts. From this, the District Court concluded that the State was entitled to compensation from PPL for the years 2000 through 2007.

¶142 PPL argues the District Court committed reversible error by failing to specify the legal basis for the State's damages claim. PPL contends that while the District Court seems to have awarded damages based solely under the HRA, the HRA, by itself, does not provide a cause of action for damages in this case. The State responds by suggesting that its claim is constitutional in nature, but does not provide any direct argument beyond that.

¶143 The District Court concluded that the State/Land Board had the constitutional authority to seek compensation for PPL's use of state-owned lands under Article X, Section 11 of the Montana Constitution. The State, in its counterclaims, had sought a declaration to this effect under the Uniform Declaratory Judgment Act (UDJA), Title 27, chapter 8, MCA. Section 27-8-201, MCA, of the UDJA reads as follows:

> Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree.

¶144 By concluding that the riverbeds were state school trust lands and then declaring that the State/Land Board had the constitutional obligation to seek compensation for their use, the District Court essentially declared that the State had a right to seek compensation and PPL was obligated to pay it.[11] This declaration was sufficient to establish the legal obligations between PPL and the State in this case on the question of compensation.

---

[11] Although we conclude that the riverbeds in this case are public trust lands, instead of school trust lands, the Land Board still has a constitutional and statutory duty to seek compensation for their use. *See Opinion*, ¶¶ 116-117.

¶145 We now turn to the methodology and reasoning in support of the District Court's award of damages. From October 22 to October 30, 2007, a bench trial was held before the District Court, the primary focus of which was to determine how much PPL owed the State for its use of the state-owned riverbeds dating back to 1999, the year PPL acquired the dams. At trial, the methodology to be used by the District Court in calculating the amount of compensation due was vigorously contested. The State claimed that the measure of damages payable by PPL was the full market value of the state-owned riverbeds as used for hydroelectric generation, and that the HRA provided a statutory mechanism for classifying and then valuing the riverbeds. The State's expert Dr. Duffield advocated for a valuation approach which he called the "shared net benefits" method. Under this analysis, Dr. Duffield considered the amount of electricity generation at PPL's facilities, and multiplied that figure times the price of power that was being returned, to calculate PPL's gross revenues. From that, Dr. Duffield subtracted PPL's costs in generating power to arrive at a net income, or net revenue figure. Dr. Duffield then apportioned this net income between PPL and the State, based on the State's share of the land associated with each facility.

¶146 Dr. Duffield presented several reasons in support of this proposed methodology. First, he opined that it captured the productive value of the state-owned land in a manner analogous to the share crop approach used in agricultural leases. Second, Dr. Duffield opined that a similar method was used by FERC with respect to tribal lands, and had been applied in analogous manner by the Maine Supreme Court in *Maine Central Power*. Third, Dr. Duffield asserted that PPL's status as a non-regulated, wholesale generator of

71

electricity warranted this method in order to prevent PPL from obtaining a "windfall profit" which would not adequately be captured by other methods.[12] Dr. Duffield's approach was also driven in large measure by his understanding that the State had a fiduciary obligation under the Montana Constitution to obtain full market value for the use of state lands.

¶147 PPL's expert Saleba disputed the propriety of Dr. Duffield's methodology and advocated a methodology he termed the "cost method and comparables method in tandem." Under Saleba's "cost method" approach, he used several different methodologies to establish a fair market value for PPL's hydroelectric facilities. Saleba then determined the percentage of the value of the hydroelectric facilities attributable to the land. Based on his analysis, Saleba concluded that 2.23% of the total value of PPL's hydroelectric facilities was "land-related." Saleba then used this percentage, indexed against the cost of the facilities minus depreciation, to arrive at a fair market value of the land occupied by PPL's facilities. From this fair market value figure, Saleba then calculated the annual lease payments. To arrive at a lease figure, Saleba looked to data from the United States Department of Agriculture for annual lease payments for different types of land, as well as currently available commercial lease information for Montana school trust land. From this, Saleba concluded an annual lease rate of 7% of fair market value would be appropriate.

---

[12] Because PPL is non-regulated, it does not receive a guaranteed rate of return, but instead relies on the free market to determine what it will receive for its electricity. Thus, PPL could stand to make enormous profits in some years based upon the going price for energy in the deregulated markets. Dr. Duffield opined that a fixed lease rate which did not take account of the "profits" generated by PPL would not reflect the productive value of the state-owned lands.

¶148 Saleba then applied this figure to the original cost minus depreciation of PPL's facilities and the total acreage of those facilities, to conclude that the fair market value was $28 dollars per acre. Saleba also did an estimate based on the replacement cost of the facilities, which produced a fair market value of $63 dollars per acre. Saleba also ran calculations using state tax assessment data of PPL, to arrive at a fair market value of $26.08 per acre.

¶149 To supplement this "cost methods" approach, Saleba also did a "comparables" analysis to determine if there were any comparable state or federal lease rates which could be used to gauge a lease rate for PPL's facilities in Montana. Additionally, Saleba relied upon the lease methodology utilized by FERC for the hydroelectric use of federal lands pursuant to 18 C.F.R. § 11.2 (2010). This methodology sets an annual per-acre charge for federal land flooded by a dam based on the schedule of fees for the use of linear rights-of-way prepared by the U.S Forest Service. Saleba concluded that the comparables he identified correlated well with the results arrived at by his cost methods approach. Based on his calculations, Saleba concluded that the total annual lease payments to the State for 2006 were $205,230 and $210,476 for 2007.

¶150 In its Memorandum, the District Court adopted the State's approach, concluding it was the most appropriate method to determine the full market value of the riverbeds. The District Court noted that the State has a constitutional duty to obtain full market value for the use of state-owned lands, and that the Land Board was specifically directed under § 77-1-202(1)(a), MCA, to "secure the largest measure of legitimate and reasonable advantage to the state . . ." in the administration of state lands. Furthermore, § 77-4-208,

MCA, of the HRA, specifically states the full market value use is "to be carefully ascertained from all available sources."

¶151 The District Court observed that the "shared net benefits" methodology had been primarily used by FERC in assessments involving tribal lands, but had also been applied in *Central Maine Power Co*. The District Court determined that riverbeds have "unique characteristics" making them valuable for the production of hydropower, and that the "shared net benefits" method best accounted for the economic contributions that the riverbeds make to that production. The District Court also observed that PPL had not cited to any cases where this methodology had been rejected.

¶152 In its findings of fact, the District Court defined the "shared net benefits" method in the following terms:

> Under the shared net benefits analysis, the net benefits are determined by calculating the difference between the value of power produced and the cost of producing that power. The net benefits are then shared between the project owner and the land owners. The standard share is fifty percent to the project owner and fifty percent to the land owners.

¶153 In applying this method, the District Court relied on data provided by Dr. Duffield. Dr. Duffield utilized documents produced or publicly filed by PPL, and based his net benefits calculations on the basis of state-owned riverbeds both above and below the dams. For the Thompson Falls Project, Dr. Duffield arrived at a net benefits calculation of $38,521,558 for the years 2000 through 2006. Dr. Duffield concluded that the State's share of this project was 27.3% based on its ownership of the riverbeds. Thus, he concluded the total rents due, excluding interest, to the State for this period was

74

$8,988,436. For 2007, applying this same analysis, Dr. Duffield concluded the rent for the Thompson Falls Project was $1,950,592.

¶154 For the Missouri-Madison Project, Dr. Duffield arrived at a total net benefits figure for the 2000 to 2007 timeframe of approximately $122 million dollars. Dr. Duffield then looked at the percentage of state land associated with each separate facility in the Missouri-Madison Project. Because the Hebgen Dam acts as a storage facility and does not directly produce power, Dr. Duffield allocated its benefits to the generation plants which were downstream of it. From this, Dr. Duffield determined a percentage of the State's share for each of the facilities in the Missouri-Madison Project. *See Opinion*, ¶ 76. Dr. Duffield concluded that for the Missouri-Madison Project, PPL owed the State $25,759,825 for the 2000 to 2006 time period, and $4,257,327 for 2007, excluding interest.

¶155 PPL argues the District Court erred in relying on Dr. Duffield's methodology. First, PPL contends that damages for rental value cannot be based on profits, citing *Pritchard Petroleum Co. v. Farmers Co-Op Oil & Supply Co.*, 121 Mont. 1, 190 P.2d 55 (1948), and *Goodover v. Lindey's, Inc.*, 255 Mont. 430, 843 P.2d 765 (1992). PPL bases this argument on the notion that damages are being assessed against it in this case for alleged "wrongful occupation" of property pursuant to § 27-1-318, MCA. Second, PPL claims that Dr. Duffield's methodology represents a sharp departure from the State's long-established practice of valuing riverbeds. PPL claims that the State's previously utilized valuation method for riverbeds consists of the following components: (1) appraise the value of adjacent upland property; (2) take the unit value per acre or square

75

foot; (3) multiply this value by the area that is encumbered or taken under the riverbed easement; and (4) reduce this value by 50%. PPL contends that under principles of agency law, the State is bound to adhere to its former practice in the instance case. Third, PPL claims that the District Court erred in relying on calculations which included "below dam" acreage not actually occupied by PPL's dams. PPL asserts that the "below dam" acreage consists of original riverbeds which have always been covered by water, and that water below its dams is not unlawfully occupying or "trespassing" on state lands.

¶156 Finally, PPL asserts that the "shared net benefits" method has been applied by FERC only to tribal lands, and that there are significant differences between state land and tribal land which do not warrant the application of the methodology in this case. Furthermore, PPL claims that the District Court's version of the "shared net benefits" methodology is not currently used by FERC and has, in fact, been rejected for decades. PPL, citing to *Portland Gen. Electric Co.*, 12 F.E.R.C. ¶ 63055, 1980 WL 24161 (1980), claims that under the approved FERC methodology, only profits earned above a company's expected rate of return on equity are shared with the landowners. PPL argues that Dr. Duffield's failure to include its return on equity/capital costs as a cost of producing power before he arrived at a net benefits figure is contradicted by the caselaw as well as studies by the Government Accountability Office. For these reasons, PPL asserts the District Court's calculation of damages was erroneous, and its damage award must be reversed and remanded.

¶157 The State argues the District Court did not err in its calculation of damages and application of the "shared net benefits" methodology in this case. The State asserts that

this methodology was used in *Central Maine Power* and applied by FERC and federal courts to tribal lands, *see Portland Gen. Elec. Co.*, 12 F.E.R.C. ¶ 63055, ¶ 65223, 1980 WL 24161**14-15, and *United States v. Pend Oreille Co. Pub. Util. Dist. No. 1*, 135 F.3d 602 (9th Cir. 1998), and is the most appropriate method to capture the full market value of PPL's use of state lands. The State also contends that this method accurately reflects the general approach of trust land leasing by considering the productive value of the land as used in the determination of agricultural, grazing, geothermal and wind-energy leases. *See* Admin. R. M. § 36.25.110(1) (agricultural leases based on a "crop share rental basis"); Admin. R. M. § 36.25.110(3) (grazing leases based on the "animal-unit-month carrying capacity of the land to be leased or licensed"); and Admin. R. M. § 36.25.406(1)(a)(i) (geothermal lease rates based on percentage of the gross revenues of a project). The State contends that this "income-based leasing" approach is also supported by *State ex. rel. Thompson v. Babcock*, 147 Mont. 46, 409 P.2d 808 (1966), and the purpose of the HRA itself. For these reasons, the State argues that the District Court's reliance upon Dr. Duffield's calculations and conclusions was not erroneous.

¶158 The decision to use the "shared net benefits" methodology in this case was a conclusion of law which we will review for correctness. *Roe Family, L.L.C.*, ¶ 12. The findings in support of the District Court's award of damages will be reviewed for clear error. *Baltrusch v. Baltrusch*, 2008 MT 245, ¶ 44, 344 Mont. 489, 190 P.3d 1034.

¶159 Here, the District Court did not err in its decision to rely on the "shared net benefits" methodology presented by Dr. Duffield. First, we agree with the State that it is proper to take account the productive value of the land in this case in order to arrive at a

77

figure for the fair market value of PPL's use of state-owned riverbeds. At trial, the State presented evidence that DNRC already bases the rates for agricultural and wind leases on the productive value of the land. The statutes and administrative regulations concerning agricultural, grazing, and geothermal leases bolster this argument. Second, there is no bar under Montana law for basing an award of damages on the profits made by PPL. As noted repeatedly in this Opinion, the State/Land Board is under a fiduciary duty to obtain full market value for the use of state lands. The HRA specifically provides that the determination of full market value for the hydroelectric use of state lands is to be "carefully ascertained from all available sources." Section 77-4-208, MCA. "Income-based leasing" is an appropriate methodology to use in calculating damages in this case. *See Babcock*, 147 Mont. at 52-54, 409 P.2d at 811-12. *Pritchard* and *Goodover* are inapposite because they involved damages for wrongful occupation of property, as opposed to damages based on failure to provide the State compensation as required under the Montana Constitution.

¶160 In determining the productive value of the state-owned lands for the purposes of calculating damages in this case, it was not erroneous for the District Court to rely on Dr. Duffield's method of taking into account the profits of PPL's hydroelectric projects, and then sharing those profits, or benefits, with the State based on its percentage of ownership of the project sites. Indeed, even though Saleba disagreed with the approach of Dr. Duffield, he conceded at trial that this methodology could be used in this case for purposes of assessing past damages. On direct examination, Saleba testified as follows regarding Dr. Duffield's method which he referred to as the "profitability method":

Also, on that profitability method I couldn't figure out a way to do this prospectively. It seemed like one of the things that the Court is going to be challenged with for PP&L Montana is the amount break—or going back to 2000, as well as coming up with the charge going forward.

And, you know, **you could arguably use the profitability method to go back and figure out what the profitability was from 2000 to 2006 or 2007.** I don't know how you use the profitability method to go forward.

(Emphasis added.)

¶161 Technically speaking, the methodology relied upon by Dr. Duffield is not what is generally termed the "shared nets benefits" analysis. This method was described in *Portland Gen. Elec. Co.*, 20 F.E.R.C. ¶ 61294, 1982 WL 40297 (1982), working:

> by comparing the cost of producing power at the project being evaluated with the cost of producing an equivalent amount of power *at a hypothetical next-best alternative project.* The difference in costs is referred to as the net benefit of the project being evaluated. The net benefit is then allocated between the parties intended to benefit from the project.

*Portland General*, 20 F.E.R.C. ¶ 61294, ¶ 61563, 1982 WL 40297 ** 33; *see also Pend Oreille*, 135 F.3d at 609.

¶162 Dr. Duffield did not strictly follow this approach, because he did not consider the "next available alternative" to hydroelectric generation. Instead, Saleba's characterization of Duffield's approach as a "profitability" approach is indeed more accurate. *See Portland Gen. Elec. Co.*, 12 F.E.R.C. ¶ 63055, ¶ 65217, 1980 WL 24161 ** 5 (discussing the profitability method). However, the approach was appropriate here because the net benefits from PPL's projects for the years 2000 to 2007 are already known and are not based upon speculation. *See Portland Gen. Elec. Co.*, 12 F.E.R.C. ¶ 63055, ¶ 65223, 1980 WL 24161 ** 14 (noting that the profitability method is appropriate when actual cost figures are available for a given project).

¶163 Moreover, we conclude that the District Court's findings of fact in applying this method were not clearly erroneous. Dr. Duffield's profit figures were all provided by PPL or taken from documents which PPL publicly filed. The inclusion of the "below the dam" acreage in this case was not clearly erroneous because § 77-4-202, MCA, of the HRA specifically defines "power site" as including "each separate tract of [state-owned] land which will become part of the reservoir and which in and of itself makes an essential contribution to the value of the power site as a whole of not less than 5% of the entire value of such power site." The inclusion of the "below the dam" acreage was contemplated within the plain meaning of this statute, and it was not clearly erroneous for the District Court to include it in its calculation of damages.

¶164 As PPL notes, Dr. Duffield's approach considered the total profitability of PPL's facilities in Montana, but did not deduct PPL's expected rate of return on equity prior to an accounting of the net profits. PPL argues that under approved FERC methodology only profits earned above a company's expected rate of return on equity should be shared with the landowners. PPL urges this Court to remand this issue to the District Court for a recalculation of damages under *Portland Gen. Elec. Co.*, 12 F.E.R.C. ¶ 63055, 1980 WL 24161 and *Mont. Power Co.*, 38 F.P.C. 766, 1967 WL 113478 (1967), whereby the District Court would only consider sharing those profits over and above PPL's expected rate of return on equity.[13] PPL argues that Dr. Duffield's methodology in this regard is not supported by the case law and that it was error for the District Court to rely upon it.

---

[13] Roughly speaking, PPL's rate of return on equity is calculated by taking the amount of net income for a given year and then dividing that number by the amount of PPL's privately-held equity (i.e., the amount of non-bank, and non-bond financing held by private investors in PPL).

¶165 Although PPL is correct in noting that Dr. Duffield's methodology is unique, it has failed to demonstrate how it was incorrect for the District Court to rely upon this methodology as a matter of law. At trial, Dr Duffield acknowledged that his methodology was singular and unique, but presented a rationale for his departure from the approaches in *Portland Gen. Elec. Co.* and *Mont. Power Co*. The utility companies in both of those cases were regulated entities who were granted monopolies as well as a guaranteed a rate of return by the state's ratepayers. In exchange, the regulated utilities provided energy at a guaranteed rate for the consumers. Dr. Duffield referred to this as a "social contract" between the utilities and the rate-paying public. When considering the shared nets benefits or "profitability" analysis in this type of context, deducting the ratepayer's return on equity was an appropriate consideration because the regulated utilities are not granted a level of profitability above and beyond the guaranteed rate of return.

¶166 Here, by contrast, PPL is an unregulated utility and its rate of return is determined by market forces. Although PPL is not guaranteed a rate of return by Montana's ratepayers, there is no ceiling on the amount of profits that PPL can make in the unregulated market. If the return on equity of PPL's private investors is deducted before assessing PPL's "profitability," the private investors are allowed to reap the benefits of any "windfall" profits before sharing a fair portion of them with the State—even though the state-owned land makes the hydroelectric facilities possible and contributes greatly towards their profitability.

¶167 Second, Dr. Duffield explained that that the riverbeds' status as "trust lands" required a methodology which properly took into account the State/Land Board's obligation to administer and dispose of those lands for the benefit of the people of Montana. Dr. Duffield reasoned that allowing private investors to deduct their rate of return prior to assessing PPL's net profits, would run afoul of this principle. For these reasons, Dr. Duffield employed his unique methodology and it was adopted by the District Court.

¶168 PPL clearly disagrees with Dr. Duffield's methodology. Yet aside from referring to the *Mont. Power Co.* and *Portland Gen. Elec. Co.* cases and arguing that Dr. Duffield's methodology was unprecedented, PPL does not show why, under the circumstances and evidence presented to the District Court, this methodology was incorrect as a matter of law. Given the unique circumstances before the District Court, and PPL's status as an unregulated utility operating on public trust lands, the District Court did not err as a matter of law in refusing to deduct a rate of return on privately-held equity prior to assessing PPL's profitability. Accordingly, we find no legal basis upon which to reverse the District Court's decision in this regard.

¶169 Finally, the District Court held that the terms of any future lease, including the calculation of rent, must be approved by the Land Board. The case sub judice is concerned solely with damages based on PPL's failure to compensate the State/Land Board for the use of public lands; thus, the damages in this case are past damages. The methodology applied by the Land Board to the terms of a future lease may or may not be the same methodology used by the District Court in calculating damages in this case.

¶170 In closing, we take note of the fact that several amici in this case, including the Montana Water Resources Association, the Gallatin Agricultural Irrigators, and the Montana Farm Bureau Federation, have expressed concern that our decision here will have a negative impact on their ability to appropriate water from rivers. While we do conclude that the state-owned riverbeds are public trust lands and that PPL does not have a right to use those riverbeds for free, this does not imply that all other water users will be assessed a fee for usage in the same manner as PPL. As Article X, Section 11(2) of the Montana Constitution makes clear, "[n]o such land or any estate or interest therein shall ever be disposed of except in pursuance of general laws providing for such disposition, or until the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, has been paid or safely secured to the state." In other words, the Legislature may pass "general laws" providing for the use of state-owned riverbeds by various users of water. *See e.g. Norman*, 182 Mont. at 444, 597 P.2d at 718. In this case, the HRA was the "general law" which the District Court used to assess damages because it specifically provided for the disposition of state-owned lands occupied by PPL's facilities. Other general laws may (or may not) provide an assessment method for irrigators, stockmen, recreationists, and other water users, in a manner that takes account of the "public trust" with respect to these different classes of usage. While the Land Board clearly has a fiduciary duty to administer Montana's riverbeds in the public interest, the Court's decision today is cabined to the specific facts of this case and the applicable provisions of the HRA.

**CONCLUSION**

¶171 In general, we affirm the District Court's award of damages. We affirm the District Court's conclusion that title to the riverbeds of the Missouri, Clark Fork, and Madison Rivers passed to Montana when it became a state in 1889. However, we reverse the District Court's conclusion that the riverbeds are "school trust lands," and instead hold that they are public trust lands under Article X, Section 11. Our reversal on this issue does not change the overall conclusions of the District Court, because under the 1889 and 1972 Montana Constitutions the State and Land Board have fiduciary obligations to administer those lands for the benefit of the public.

¶172 Further, the HRA provides an appropriate mechanism with which to assess damages owed by PPL to the State. The District Court did not err in adopting a methodology for assessing damages based on the HRA, and its findings of fact in support of its damage award were not clearly erroneous.

¶173 Finally, the District Court correctly left to the discretion of the Land Board the terms of any future lease. In arriving at a lease with PPL, the Land Board is not bound to rely upon the methodology adopted by the District Court in calculating past damages in this case. Affirmed.

/S/ PATRICIA O. COTTER

We concur:

/S/ KURT KRUEGER
District Court Judge Kurt Krueger
sitting for Chief Justice Mike McGrath

84

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON

/S/ EDWARD P. McLEAN
District Court Judge Edward P. McLean
sitting for retired Justice John Warner

Justice Jim Rice, dissenting.

¶174  I believe the Court has erred in its analysis of the law governing title navigability and also failed to properly apply the tenets of summary judgment by disregarding genuine material factual conflicts.

¶175  M. R. Civ. P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party moving for summary judgment "has the initial burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law." *Roe v. City of Missoula*, 2009 MT 417, ¶ 14, 354 Mont. 1, 221 P.3d 1200 (citations omitted). "A material fact is a fact that involves the elements of the cause of action or defenses at issue to an extent that necessitates resolution of the issue by a trier of fact." *Corp. Air v. Edwards Jet Ctr.*, 2008 MT 283, ¶ 24, 345 Mont. 336, 190 P.3d 1111 (quoting *Arnold v. Yellowstone Mt. Club, LLC*, 2004 MT 284, ¶ 15, 323 Mont. 295, 100 P.3d 137). After

the moving party meets its burden, the nonmoving party then bears the burden to establish that a genuine issue of material fact exists. *Roe*, ¶ 14. This burden is to demonstrate "by more than mere speculation that a genuine issue of fact exists." *Willden v. Neumann*, 2008 MT 236, ¶ 13, 344 Mont. 407, 189 P.3d 610.

¶176 To determine whether PPL created a genuine issue of material fact by more than mere speculation, it is first necessary to outline the legal principles which govern the dispute and which establish entitlement to a judgment as a matter of law. Under the Equal Footing Doctrine, Montana gained title at the time of statehood to all submerged lands under navigable waters. *See Pollard's Lessee v. Hagan*, 44 U.S. 212, 229 (1845); *see also* 43 U.S.C. § 1311(a). Navigability is a question of federal law, and in determining whether "rivers are navigable in law," courts must first determine whether rivers are "navigable in fact." *Mont. Coalition for Stream Access, Inc. v. Curran*, 210 Mont. 38, 43, 682 P.2d 163, 166 (1984) (citing *The Daniel Ball*, 77 U.S. 557 (1870)); *see also U.S. v. Holt State Bank*, 270 U.S. 49, 55-56, 46 S. Ct. 197, 199 (1926). The elements necessary to establish navigability are: "(1) [the river] was used or was susceptible of being used, (2) as a highway of useful commerce, (3) in its natural and ordinary condition, and (4) by the customary modes of trade and travel at the time of statehood." *N.D. ex rel. Bd. of U. and Sch. Lands v. U.S.*, 972 F.2d 235, 238 (8th Cir. 1992) (citing *Holt State Bank*, 270 U.S. at 56, 46 S. Ct. at 199). If the facts presented substantiate all of the above elements, then title to the streambeds passed to Montana at statehood. *See Pollard's Lessee*, 44 U.S. at 228-29. If, on the other hand, the facts fail to

satisfy one of these elements, then title to the streambeds did not pass to Montana. *See*

*Shively v. Bowlby*, 152 U.S. 1, 26-27, 14 S. Ct. 548, 557-58 (1894).

¶177   While this "navigability for title" test has similarities to navigability as determined

for exercise of the federal government's Commerce Clause power, the two tests are

nonetheless different—a distinction which the District Court failed to make when relying

upon commerce cases, discussed below.   It has been explained that "for purposes of

establishing title to land pursuant to the rule of state sovereign ownership, the federal

navigability test is in fact both broader and narrower than the navigability test for

commerce clause purposes." *Water and Water Rights* vol. II, § 30.01(d)(3) (Robert E.

Beck et al. eds., 3d ed., LexisNexis Supp. 2009).   The navigability for title test is broader

because rivers need not accommodate "interstate commerce." *Water and Water Rights* at

§ 30.01(d)(3); *see also U.S. v. Utah*, 283 U.S. 64, 75, 51 S. Ct. 438, 441 (1931).   The

rivers instead only need to be susceptible to "[i]ntrastate [c]ommerce" because, for

example, "the fact that the Great Salt Lake is not part of a navigable interstate or

international commercial highway in no way interferes with the principle of public [i.e.,

state] ownership of its bed." *Water and Water Rights* at § 30.01(d)(3)(A) (quoting *Utah

v. U.S.*, 403 U.S. 9, 10, 91 S. Ct. 1775, 1776 (1971)).[1]   Further, title passes to the states

even if there was no "*actual* use for local commerce," as "*susceptibility* to local use" is

sufficient. *Water and Water Rights* at § 30.01(d)(3)(A) (citing *The Montello*, 87 U.S. 430

(1874)) (emphasis in original).   The navigability for title test is also narrower because,

---

[1] *Utah v. U.S.*, 403 U.S. 9, 91 S. Ct. 1775, cited here, is to be distinguished from *U.S. v. Utah*, 283 U.S. 64, 51 S. Ct. 438.   The latter case is the primary authority relied upon herein, and referred to as "*Utah*."

unlike navigability as analyzed under the Commerce Clause, navigability for title is determined by a specific time period. "[T]he [navigability for title] test is to be applied as of the time of the Revolution, in the case of the original states, and at the time of admission, in the case of the remaining states, rather than at the time of the litigation." *Water and Water Rights* at § 30.01(d)(3). Consequently, because Montana entered the Union on November 8, 1889, the courts must apply the navigability for title test at that time, a factual question about which PPL submitted substantial evidence and attacked the State's case for its failure to do so.

¶178 Importantly—and I believe the Court begins to get off track in its substantive legal analysis here—in applying the navigability for title test, courts are not to assume an *entire river* is navigable merely because certain reaches of the river are navigable, and likewise, are not to conclude that non-navigable reaches render an entire river non-navigable. *See Utah*, 283 U.S. at 80-81, 89-90, 51 S. Ct. at 442-43, 446. Instead, courts look to relevant portions of a river and, based upon the facts, determine whether particular reaches at issue are navigable or non-navigable. *See Utah*, 283 U.S. at 73-74, 51 S. Ct. at 440. In *Utah*, the federal government brought suit to quiet title to "certain portions of the beds of the Green, Colorado, and San Juan rivers within the state of Utah . . . ." *Utah*, 283 U.S. at 71, 51 S. Ct. at 439. The Court referred the case to a special master to make findings of fact, conclusions of law, and recommendations for decree. *Utah*, 283 U.S. at 72, 51 S. Ct. at 439-40. After making extensive findings of fact with respect to the "topography of the rivers, their history, impediments to navigation, and the use, and susceptibility to use, of the rivers as highways of commerce," the special master

found that *some portions* of the rivers were navigable while others, such as the forty-mile stretch on the Colorado River located above Lees Ferry, were not. *Utah*, 283 U.S. at 73-74, 51 S. Ct. at 439-40.

¶179   In its review of the special master's report, the *Utah* Court affirmed the propriety of applying a section-by-section analysis, stating "[e]ven where the navigability of a river, speaking generally, is a matter of common knowledge, and hence one of which judicial notice may be taken, it may yet be a question, to be determined upon evidence, *how far navigability extends*." *Utah*, 283 U.S. at 77, 51 S. Ct. at 441 (citing *U.S. v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698, 19 S. Ct. 770, 773 (1899)) (emphasis added). The Court thus analyzed whether a reach of roughly four miles should have been included within the larger reach of water found to be non-navigable, and reversed the special master's conclusion as to the four-mile reach. *Utah*, 283 U.S. at 89-90, 51 S. Ct. at 446. The Court thus concluded that the State of Utah owned portions of the river in question which were navigable at statehood, and that the federal government owned the remaining portions. *Utah*, 283 U.S. at 90-91, 51 S. Ct. at 446. The Court explained it was not concerned with a "short interruption" or "negligible part" of a stream, but with "long reaches with particular characteristics of navigability or nonnavigability"—which meant a reach of four miles in that case. *Utah*, 283 U.S. at 77, 51 S. Ct. at 441.

¶180   The Court acknowledges that *Utah* analyzed a roughly four-mile "stretch" of the Colorado River to determine its navigability, but nonetheless concludes that the same section-by-section approach is improper here. Opinion, ¶ 107. Apparently attempting to avoid the consequences of *Utah*'s application—and of PPL's considerable evidence—the

Court treats *Utah*'s approach, not as a framework for analysis, but essentially as an anomaly which resulted when the State of Utah challenged the navigability of only four miles and not the remaining thirty-six miles within that reach of the Colorado River which the special master had concluded was non-navigable. *See* Opinion, ¶ 107. While it is correct that *Utah* judged only four miles of the River—the reach at issue—to conclude therefrom that *Utah* does not sanction a sectional approach is an illogical rendering which ignores both the Supreme Court's approach and the actual result of that case. *Utah* was a proceeding between Utah and the federal government which ultimately determined that there were two different titleholders to the streambeds of a particular reach of the Colorado River—Utah owned four miles and the federal government owned the remaining thirty-six miles. *Utah*, 283 U.S. at 74, 90-91, 51 S. Ct. at 440, 446. Contrary to the Court's view, *Utah* demonstrates the propriety of applying a section-by-section analysis to determine where navigability begins and "how far navigability extends." *Utah*, 283 U.S. at 77, 51 S. Ct. at 441 (citation omitted). Recognizing that navigable and non-navigable reaches may coexist on the same river, the Court refrained from making categorical pronouncements about a river's status. This section-by-section approach has been used by many courts. *See e.g. Brewer-Elliott Oil & Gas Co. v. U.S.*, 260 U.S. 77, 86, 43 S. Ct. 60, 63 (1922) ("[T]he Arkansas is and was not navigable *at the place where the river bed lots, here in controversy, are*." (Emphasis added.)); *Alaska v. Ahtna, Inc.*, 891 F.2d 1401, 1406 (9th Cir. 1989) (only addressing navigability for the "lower Gulkana [River]"); *Or. v. Riverfront Protec. Assn.*, 672 F.2d 792, 793 (9th Cir. 1982) ("This appeal poses the question whether the McKenzie River between river mile

37 and its confluence with the Willamette River was navigable . . . .”); *Utah v. U.S.*, 304 F.2d 23, 26 (10th Cir. 1962) (“[W]e share with the trial court the view that the *part* of the river in question was in fact and in law non-navigable at the time Utah was admitted into the Union.” (Emphasis added.)); *Northwest Steelheaders Assn., Inc. v. Simantel*, 112 P.3d 383, 393 (Or. App. 2005) (“[T]he *segments* of the John Day River at issue here . . . .” (Emphasis added.)).

¶181 With regard to this substantive issue, PPL argues that “if individual river reaches include non-navigable falls and other obstructions, *those reaches* are not considered navigable for title.” (Emphasis added.) The Court misstates PPL's argument on this point, stating that PPL has argued “virtually *every stretch* of a river must be ‘navigable in fact’ and that particular stretches of a river which are non-navigable due to their physical characteristics can defeat a finding of navigability with respect to the *whole river* . . . .” Opinion, ¶ 105 (emphasis added). However, PPL does not make such an overreaching argument. It argues only for certain reaches to be declared non-navigable under *Utah*'s approach.

¶182 Disturbing to me is that the Court is declaring, as a matter of law, that the reaches claimed by PPL to be non-navigable are simply too “short” to matter. The Court refuses to consider the factual navigability of the disputed reaches of the Missouri, Clark Fork, and Madison Rivers because it deems them to be “relatively short” and presumably, in the words of the *Utah* Court, mere “negligible parts.” Opinion, ¶ 108. The Court looks at the disputed reaches, calculates their distance, and decides the significance of these distances in order to legally determine the factual question of navigability on each

91

individual river—all while ignoring or rejecting PPL's evidence that navigability did not, and could not, have existed at the time of statehood. Opinion, ¶ 108. The Court concludes that all of the challenged reaches of all the rivers are "relatively short" and thus unable, as a matter of law, to be declared non-navigable for title purposes. Opinion, ¶ 108. This is opposite to the approach taken in *Utah* and, critically, is done without the benefit of the extensive factfinding done in *Utah* on the "topography of the rivers, their history, impediments to navigation, and the use, and susceptibility to use, of the rivers as highways of commerce." *Utah*, 283 U.S. at 73, 51 S. Ct. at 439-40.

¶183  The nuances of the test for title navigability underscore the critical nature of the facts and circumstances of each case, and why the Supreme Court has described the issue as one requiring a fact-intensive inquiry. *Utah*, 283 U.S. at 87, 51 S. Ct. at 445. "Each determination as to navigability must stand on its own facts." *Utah*, 283 U.S. at 87, 51 S. Ct. at 445. Recognizing this fact-intensive inquiry, PPL submitted a "mountain"—over 500 pages—of affidavits and exhibits demonstrating that the portions of the Missouri, Madison, and Clark Fork Rivers at issue were non-navigable at the time of statehood. This evidence, if accepted after a trial, would lead inevitably to the conclusion that the State did not hold title to the streambeds at issue and was not entitled to receive compensation for their use. Further, PPL provided evidence and critical analysis challenging the State's position that the relevant portions of the rivers were in fact navigable, summarized by University of Montana Professor David Emmons, who stated that "[h]ad the State been a student of mine at the University of Montana, presenting its brief as a paper on the historical uses of the relevant reaches of the Missouri, Madison

92

and Clark Fork Rivers, it would have received a failing grade for not following the most fundamental tenets of historical analysis." While the validity and credibility of the State's evidence would have been, or should have been, determined at trial, PPL's double-pronged attack serves to demonstrate the significance of the factual issues which exist in this case.

¶184 The law recognizes that "[s]ummary judgment is an extreme remedy that should never be a substitute for a trial on the merits if a controversy exists over a material fact." *Corp. Air*, ¶ 24 (citing *Mary J. Baker Revocable Trust v. Cenex Harvest*, 2007 MT 159, ¶ 17, 338 Mont. 41, 164 P.3d 851). Further, "it is important to note that at the summary judgment stage, the court does not make findings of fact, weigh the evidence, choose one disputed fact over another, or assess the credibility of witnesses." *Andersen v. Schenk*, 2009 MT 399, ¶ 2, 353 Mont. 424, 220 P.3d 675. The proper inquiry is not merely whether the State presented sufficient evidence to support a conclusion of navigability as a matter of law; rather, the question is whether PPL created material factual conflicts by way of evidence which was not speculative, thus requiring the navigability question to be decided after trial. I thus turn to the evidence PPL produced for each river in question at the time of statehood.

A.     **The Madison River**

¶185 Initially, it should be noted here that although the Court faults PPL for challenging only "relatively short" reaches, in actuality PPL has challenged the navigability of the *entire* Madison River. PPL submitted various historical documents in conjunction with an affidavit by Professor Emmons, including a 1931 Report to Congress prepared by the

93

Army Corps of Engineers. Addressing the same stretches of the Madison River which are at issue here, the Army Corps of Engineers concluded that "[a]s far as is known there has never been any navigation on these streams, *and commercial navigation on them is entirely out of the question.*" (Emphasis added.) Professor Emmons' analysis brought him to the conclusion, regarding the navigability of the Madison at statehood, that: "It is my opinion as a historian that credible evidence in the form of a report actually prepared <u>by</u> the Corps of Engineers demonstrates that the Madison River was not used or capable of use for commercial navigation." (Emphasis in original.)

¶186 One may be inclined to think of the Madison River as currently navigable, and thus PPL asked Dr. Stanley A. Schumm, a fluvial geomorphologist, to evaluate "whether the current physical conditions of the Madison River, with respect to navigability, were the same as or different than the physical conditions at the time of Montana's admission to the Union in 1889." Dr. Schumm summarized his analysis in an affidavit:

> In my expert opinion, the current physical conditions of the Madison River, with respect to navigability, are not the same as the conditions of the river in 1889 when Montana entered the Union. First, the construction and operation of the hydroelectric projects and reservoirs have materially changed the flow characteristics in the river. It is my understanding that the Madison hydroelectric project, including the reservoir known as Ennis Lake, was constructed over a course of years in and around 1906 and that the Hebgen reservoir project, known as Hebgen Lake, was constructed over a course of years in and around 1912 . . . . By making the flow lower during periods of high flow and higher during periods of low flow, the operation of the hydroelectric projects and reservoirs have made the river more susceptible now to commercial navigation than it would have been without them. Second, my review of the historical descriptions of the Madison River indicate that the location and number of the river channels have changed since the time of statehood and that relevant portions of the river appear to have been either anastomosing or braided at the time of statehood. *Because reaches of the Madison River appear to have been*

*either anastomosing or braided, my opinion is that it was not susceptible to navigation at the time of statehood.*

(Emphasis added.)[2] PPL thus contested consideration of the current state of the Madison River in determining its navigability at statehood. For purposes of summary judgment, PPL demonstrated that the Madison River today is not the same as it was at the time of statehood, and that, at that time, it was not navigable.

¶187 PPL did not quit there. As noted above, for each river in question PPL also offered expert analysis which critiqued and sought to undermine the evidence offered by the State. First, PPL claimed that the State's use of the Lewis and Clark Expedition to prove the navigability of the Madison River at statehood was faulty, asserting that "Lewis and Clark provide no evidence whatsoever regarding the navigability of the Madison River" and that the Expedition proved only "two things: that the Jefferson, Madison and Gallatin Rivers are similar at their mouths and that the Expedition chose not to try to ascend the Madison." (Emphasis in original.) Second, although the State cited to a single log drive which occurred on a reach of the Madison River, PPL countered that the log drive in question took place between West Fork and Varney—an area which did not encompass the reaches at issue in this case. Further, "[t]he mere fact that logs, poles and rafts are floated down a stream occasionally and in times of high water does not make it a

---

[2] As Dr. Schumm explains later in his affidavit, "An anast[o]mosing river is exemplified by multiple distinct channels. An anastomosing river's flow is split among the various channels and, as a result, the river stage in an anastomosing reach at a given flow is lower than in a single channel reach." Dr. Schumm also explains that "[b]raided rivers, unlike anastomosing rivers with their several distinct channels, are characterized by a single main channel with a series interlocking or tangled network of several, smaller branching and reuniting shallow channels separated from each other by islands or channel bars. Braided rivers have high width to depth ratios and relatively steep gradients. The physical characteristics of braided rivers are not conducive to navigation."

navigable river." *N.D. ex rel. Bd. of U. and Sch. Lands*, 972 F.2d at 240 (quoting *Rio Grande Dam & Irrigation Co.*, 174 U.S. at 698, 19 S. Ct. at 773). Third, PPL pointed out that the State's claim in this lawsuit was contrary to its past position. The State failed to claim title to the relevant reaches of the Madison River streambed in the early 1980s. The Department of State Lands, for example, published a list of rivers that it claimed were navigable, but claimed only one reach on the Madison River: "Based on historical documentation the Madison River is commercially navigable from the confluence of its west fork to Varney, Montana. Therefore the state claims ownership of the Madison River between these two points." As with the State's log float evidence, this claimed reach did not cover the current reaches at issue. Because the State's witness could not explain why the State "now claims the entire Madison as navigable at statehood," PPL was able to posit that the State had already, at least implicitly, "[a]dmitted" that it did not own the reaches it now claims.

¶188 Fourth, the State relied heavily upon the *current use* of the Madison River as evidence that the river was susceptible to navigation over 100 years ago. PPL's evidence and analysis criticized the State's emphasis of this modern evidence, a position for which there is clear legal support. *See N.D. ex rel. Bd. of U. and Sch. Lands*, 972 F.2d at 240 ("[M]odern day canoe use and modern day 'boatability' data are not reliable indicators of the River's navigability at statehood."). PPL argued the current use of the Madison River was irrelevant because it could not shed light on the navigability of the Madison River at the time of statehood. Finally, the State presented a 1986 Montana Navigable Water Study prepared by the Heritage Research Center in Missoula for the Department of State

Lands. Professor Emmons acknowledged the Study, but opined it was untrustworthy due to its budgetary constraints and flawed historical analysis. The Study itself acknowledged that it was incomplete "[d]ue to the funding limitations," and explained that "[b]ecause the approach to documenting navigable waterways for title purposes has been constrained by lack of funding, efforts have been focused upon generating the most information for the least possible cost."[3] Emmons also pointed to problems in the Study's methodology, noting it was "overly dependent on two of the least trustworthy historical sources to [w]estern historians—frontier-era newspapers and personal memoirs or reminiscences." Emmons found western frontier-era newspapers were suspect because "they were often vehicles used by local communities to promote the community to possible occupants and business investors . . . [and] [f]rontier-era newspaper editors often acted more as unabashed promoters of economic development than unbiased news reports."[4]

---

[3] Budgetary concerns were exactly why the Historical Research Associates (HRA) refused to submit a bid for the Study. HRA informed the State, that it had

> extensive experience in this type of research, both for Montana waterways and for waterways in other western states. Based on this experience we are familiar with the amount of time required to provide our clients with a solidly researched and defensible product. Unfortunately, we do not think that we could provide the necessary document given the stated project ceiling and the stipulation that no additional costs incurred would be reimbursed. Therefore, given the Department's budgetary constraints, HRA is not able to offer a proposal on this project.

[4] Emmons' analysis is consistent with what he teaches to his students and writes in his books. In class, "[Emmons] taught [his] students in [a class entitled] The Historian's Craft that frontier-era newspapers, because of their promotional nature, should never be used as sole primary historical sources as they were used for the [1986 Montana Navigable Water] Study." (Emphasis in original.) Emmons similarly wrote in his book, *Gardens in the Grassland*: "[T]he most

¶189 The District Court began by recognizing "[t]here apparently is little historical documentation regarding the navigability of the Madison River." The court then quoted and relied upon the 1986 Montana Navigable Water Study—thereby granting validity and credibility to the very Study which was admittedly incomplete and about which Emmons explained was an unreliable source. The court further reasoned that the 1986 Study had referenced a 1913 log float from the mouth of the West Fork of the Madison to Varney and that Hebgen Lake "has been navigated." As explained above, this log float and the navigability of Hebgen Lake were of no legal consequence because the log drive did not cover the reaches currently at issue and Hebgen Lake did not exist at the time of statehood. *See e.g. Riverfront Protec. Assn.*, 672 F.2d at 794 n. 1 ("Navigability for title . . . must exist at the time the State is admitted into the Union. Also it must exist in the river's ordinary condition . . . . [I]t cannot occur as a result of reasonable improvements.") (citing *Utah*, 283 U.S. at 75-76, 51 S. Ct. at 440-41).

¶190 Disregarding the considerable evidence PPL had presented, the District Court chose to accept the State's evidence in concluding no genuine issue of material fact existed about the navigability of the Madison River at statehood. Perhaps most disconcerting is the fact that the Study relied upon by the District Court itself acknowledges its work on the issue was incomplete. The District Court thus violated the principles governing summary judgment.

---

representative example of the mood of western boomerism . . . was the local newspapers. No one ever doubted the press' commitment to growth or its eagerness to engage in promotional hyperbole."

¶191 The Court does the same thing. It first claims that the Report prepared by the Corps of Engineers in the 1930s was merely "conclusory" and "insufficient as a matter of law to raise genuine issues of material fact." Opinion, ¶ 103. The Court likewise disregards Dr. Schumm's expert opinion that the current condition of the Madison River is completely different than at the time of statehood. Instead, the Court relies on *Ahtna*, 891 F.2d at 1403—a case where parties had *stipulated* the river in question had remained the same since statehood—and *Utah*, 283 U.S. at 82-83, 51 S. Ct. at 443-44—a case presenting no factual issue about whether the rivers at issue were different at statehood— to hold "[t]he present-day recreational use is sufficient for purposes of 'commerce' under *Utah* and *Ahtna*." Opinion, ¶ 104. The Court, like the District Court, has resorted to weighing, and ultimately discrediting: (1) the evidence and analysis clearly demonstrating for summary judgment purposes that the Madison River was non-navigable at the time of statehood, (2) an expert analysis that the Madison River at the time of statehood was completely different than its current form, and (3) historical evidence generated by a U.S. governmental agency. The Court also necessarily dismisses PPL's analytical attack upon the State's evidence. I believe these evidentiary issues should be tested at trial—including cross-examination, rebuttal, and by application of the proper burden of proof—and resolved there by the factfinder.

## B.     The Clark Fork River

¶192 PPL's evidence concerning the navigability of the Clark Fork River included the 1891 Army Corps of Engineers Report submitted to Congress. After evaluating the Clark Fork River, including the portions at issue here, the Report concluded, "[i]t is a mountain

torrential stream, full of rocks, rapids and falls, and *is utterly unnavigable, and incapable of being made navigable except at an enormous cost.*" (Emphasis added.) The Report characterized the idea of transforming the Clark Fork River into a navigable river as an "absurdity." About fifty years later, Major Mark Boatner of the Army Corps of Engineers confirmed the observations of the 1891 Report by responding to a request to determine whether the Clark Fork River was navigable:

> Receipt is acknowledged of your letter of November 14, 1940, in which you request the opinion of this office as to the navigable status of Clark's Fork of the Columbia River between Pend O'Reille [*sic*] Lake, Idaho, and the mouth of the Blackfoot River, a few miles above Missoula, Montana.
>
> For the purpose of administering the laws for the preservation and improvement of navigable waters of the United States, *this Department considers Clark Fork navigable from its mouth in Pend O'Reille [sic] Lake to the Northern Pacific Railroad Bridge, a distance of only about four miles*.

(Emphasis added.) Major Boatner's view was that the entire Clark Fork, with the exception of the referenced four-mile reach, was non-navigable. Thus, PPL's dam, which Professor Emmons explained was "far downstream" from the four-mile stretch, was in waters the Corps considered non-navigable.[5]

¶193 PPL also offered judicial decrees. In 1910, the Federal District Court of Montana concluded the Clark's Fork of the Columbia River in Sanders County, Montana, which PPL asserts is the location of its dam, "was and is a non-navigable stream incapable of carrying the products of the country in the usual manner of water transportation" and that

---

[5] This evidence further undermines the Court's assessment that PPL is only challenging "relatively short" reaches. With the exception of four miles, the reach claimed here to be non-navigable runs from Missoula, Montana, to Sandpoint, Idaho.

Northwestern Development Company, not the State, owned the portions of the streambeds at issue before the federal court. *Steele v. Donlan*, In Equity No. 950 (D. Mont. July 14, 1910).

¶194 Reviewing the evidence, Professor Emmons concluded his analysis by stating, "[C]redible evidence from the Corps of Engineers and the Montana federal court, roughly contemporaneous with statehood, leads me to conclude that the Clark Fork River in Sanders County was not a navigable highway for commerce at statehood."

¶195 Again, PPL also cast doubt on the evidence offered by the State. The State relied upon a document described as the "Clark Fork Corps Report," despite the fact it did not contain any "title page or other indication of author, date of preparation, or purpose." Professor Emmons first criticized the State's attribution of the Report to the Corps of Engineers:

> [The] report[] [was] not prepared <u>by</u> the United States Army Corps of Engineers . . . as the State contends, but rather [] [was] prepared <u>for</u> the Corps, and thus do[es] not carry any imprimatur of credibility that might be associated with an actual Corps Report. There is no indication in the evidence provided by the State that the Corps ever adopted the conclusions made or concurred in these so-called "Corps Reports."

(Emphasis in original.) Emmons then attacked the substance of the Report, stating that it relied on "untrustworthy historical sources . . . to reach conclusions regarding historical use of the rivers." Emmons explained the State's use of the "Clark Fork Corps Report" was "fallacious in three ways: (a) [the State] has taken secondary sources based on less than credible historical evidence; (b) attributed them to the more authoritative Corps of Engineers; and (c) proffered them as historical evidence of the historical use of the

rivers." Similarly, the State's reliance on the under-funded 1986 Montana Navigable Water Study was flawed because the Study had mischaracterized an article published in the *Missoulian* on February 24, 1882. The Study claimed logs were floated to Weeksville, Montana, and down the Clark Fork River. However, Emmons quoted the language of the article, which actually stated that Weeksville was "situated near the river in a body of fine timber and when the supply of logs in the immediate neighborhood gives out, they *can* be floated right to the locality down the Missoula and Pend d'Oreille rivers." (Misspelling in original, emphasis added by Emmons.) In pointing out the flawed logic in the Study, Emmons opined that "[t]here is a considerable difference historically between a frontier-era newspaper claiming that logs <u>could</u> be floated down a river and credible evidence that logs <u>were</u> actually floated down the river." (Emphasis in original.) Thus, Emmons concluded that "the State's evidence lacks the credibility to prove <u>anything</u> about the historical use" of the Clark Fork River. (Emphasis in original.)

¶196 In granting summary judgment to the State, the District Court relied on cases addressing the federal government's power to regulate commerce under the Commerce Clause. *See e.g. Mont. Power Co.*, 8 F.P.C. 751 (F.P.C. 1949); *Wash. Water Power Co.*, 10 F.P.C. 657 (F.P.C. 1951); *Wash. Water Power Co.*, 14 F.P.C. 731 (F.P.C. 1955). While these commercial, non-title cases admittedly held that the Clark Fork River was navigable at the time of statehood for that purpose, these rulings are of no consequence in light of this case's procedural posture. This is a title navigability case at the summary judgment stage. PPL set forth clear evidence of non-navigability, and construing that evidence in its favor, we must assume from that evidence—until a trial—that the

102

navigability of the Clark Fork River is a genuine issue of material fact. Instead, the District Court, and now this Court, has taken upon itself the role of factfinder, weighing PPL's evidence and concluding that it lacks credibility, rendering it mere "conclusory statements." Opinion, ¶ 103.

## C. The Missouri River

¶197 The State claimed that "[a]s anyone with even a passing knowledge of the Lewis and Clark Expedition must concede, the Missouri River is navigable in fact throughout Montana." PPL begged to differ. Professor Emmons averred that he had "acquired more than a passing knowledge of the Lewis and Clark Expedition during [his] 35 years as a professional historian in Montana. [He knew] that the Expedition did not navigate the Great Falls Reach of the Missouri because it was impossible for them to do so." (Emphasis in original.) Emmons explained:

> To my knowledge as a professional historian, there has never been any navigation on the Missouri River in the Great Falls Reach because the physical characteristics of the falls prevent it. Captain William Clark prepared a map describing the features of the Great Falls Reach of the Missouri River. On this map, Captain Clark listed fifteen different rapids and nine waterfalls, including the five named waterfalls in this reach: (1) Black Eagle Falls – 26 ft. 5 in. descent, (2) Colter Falls (now submerged) – 14 ft. 7 in. descent, (3) Beautiful Cascade (now named Rainbow Falls) – 47 ft. 8 in. descent, (4) Crooked Falls – 9 ft. descent, and (5) the Great Falls of the Missouri – 87 ft. 3/4 in. descent.

(Emphasis in original.) Further, Emmons cited to an 1896 inquiry by Samuel Hill, who asked the War Department whether a permit was required for maintenance on the dam constructed immediately above Black Eagle Falls on the Missouri River. J.C. Sanford, Captain of the Corps of Engineers, conducted a Report which stated:

The dam referred to is located just above the Black Eagle Falls of the Missouri River, and is 3 1/4 miles below the railroad bridge at the town of Great Falls. About 400 feet above this bridge begins the series of rapids and falls in which the river falls 412 feet in a distance of 11 miles . . . . This portion of the river can, in my judgment never be made navigable at a cost that the demands of commerce will ever justify.

Relying upon Captain Sanford's Report, the War Department responded to Mr. Hill's request, informing him that no permit or action of the War Department was required.

¶198  PPL also provided a Report from the War Department for the Fiscal Year that ended June 30, 1898. The Report concluded the reach *from Fort Benton to Great Falls* was "an unnavigable section occupied by cataracts and dangerous rapids." It also detailed various navigation improvement projects contemplated for the reach between Great Falls and Stubbs Ferry, within the upper reach of the Missouri, south of Great Falls. The Report estimated that the cost of creating a mere *three-foot deep* channel from Cascade to Great Falls would be $213,646.50 in 1898 dollars.

¶199  Based upon his review of the evidence, Professor Emmons opined that "credible historical evidence demonstrates clearly that the Great Falls Reach of the Missouri River is not and has never been navigable and that the reach of the Missouri River between Great Falls and Stubbs Ferry would have required post-statehood improvements to support commercial navigation." *See e.g. Riverfront Protec. Assn.*, 672 F.2d at 794 n. 1 ("Navigability for title . . . must exist at the time the State is admitted into the Union. Also it must exist in the river's ordinary condition . . . . [I]t cannot occur as a result of reasonable improvements.").

¶200  Once again, PPL challenged the validity of the State's evidence on this river.  The State had cited to the Missouri Corps Report, which claimed that "fur trappers [ ] plied the waters of the Upper Missouri through territorial days," and that "[a]fter the discovery of gold, miners and settlers floated the river to Great Falls and Ft. Benton from the Helena area mining districts."  PPL offered Emmons' assessment:

> Besides the fact that the geography of the Great Falls Reach of the Missouri River makes it utterly impossible that these miners actually floated the entire river to Fort Benton, there are considerable historical problems with the source of these reports, Hubert Hugh Bancroft.  Bancroft (a nineteenth-century book seller and antiquarian) did not write anything that approaches what the State refers to in its Brief as "historical works generally considered authentic."  He is not an authentic source of historical information.  One historian, Kevin Starr, referred to Bancroft: "as a historian, [he] was often ludicrous and sometimes dishonest."  I know of no professional historian who would use Bancroft as a credible historical source, as the State has done.

Emmons perceived that "[i]nstead of relying on more credible sources such as court records, business records or governmental reports, the State relies exclusively on secondary sources that by their own admission are limited in scope and which rely on untrustworthy primary sources to reach their conclusions."  Further, PPL rebutted the State's legal argument that our previous precedent had established navigability for title purposes of the entire Missouri River.  The State had relied upon *Gibson v. Kelly*, 15 Mont. 417, 39 P. 517 (1895) and *Herrin v. Sutherland*, 74 Mont. 587, 241 P. 328 (1925), but as PPL correctly pointed out, in neither *Gibson* nor *Herrin* had either party contested the issue of navigability for title.  *Gibson*, 15 Mont. at 417, 39 P. at 517; *Herrin*, 74 Mont. at 594, 241 P. at 330.  Thus, this issue had never been previously decided by this Court.

105

¶201 The District Court dismissed PPL's evidence and relied upon *Mont. Power Co. v. Fed. Power Commn.*, 185 F.2d 491 (D.C. Cir. 1950), a non-title case, to enter summary judgment in favor of the State. The Court decides similarly, reasoning that PPL has challenged only "relatively short" reaches. Opinion, ¶ 108. In particular, when reviewing the Missouri River, the Court states that "[t]he Great Falls Reach, even though a roughly 17-mile stretch of the Missouri River, is merely a short interruption . . . ." Opinion, ¶ 108. The Court does not explain why a non-navigable reach running from Fort Benton to Great Falls is too "short," and how it can so declare as a matter of law without factfinding. These determinations necessarily require a factfinder to consider each interruption in the context of the facts about the "topography of the rivers, their history, impediments to navigation, and the use, and susceptibility to use, of the rivers as highways of commerce." *Utah*, 283 U.S. at 73, 51 S. Ct. at 439-40.

¶202 I would agree with the Court that, with respect to all the relevant reaches of the Madison, Clark Fork, and Missouri Rivers, the State met its initial burden to prove navigability under the title test. The Court's initial statement is thus correct: "The evidence presented by the State was clearly sufficient to demonstrate navigability in fact under this test . . . ." Opinion, ¶ 101. But the summary judgment inquiry is not supposed to end there. Without judgment as to weight or credibility, we are to determine whether PPL raised genuine factual issues by more than mere speculation. Clearly, PPL has done so. There is nothing "insufficient" or "conclusory" about PPL's evidence. Rather, its evidence is relevant and material. PPL has satisfied its burden to produce substantial evidence that the disputed reaches of the rivers were, at the time of statehood, non-

106

navigable. The Court's decision to the contrary makes one wonder just what evidence the Court would have considered sufficient for PPL to defeat summary judgment in this case.

¶203 Consistent with the legal standards, this Court has steadfastly guarded against depriving a party of the right to trial by the improper entry of summary judgment. Today, I believe we step back from the protection of that right. I would not do so, but would reverse the District Court's entry of summary judgment and remand for trial.


/S/ JIM RICE


Judge Mike Salvagni joins in the dissenting opinion of Justice Rice.


/S/ MIKE SALVAGNI
Honorable Mike Salvagni,
District Judge, sitting in place of
Justice Brian Morris